Strafford
No. 2003-069

THE STATE OF NEW HAMPSHIRE

v.

AMANDA BORTNER

Argued: January 7, 2004
Opinion Issued: February 2, 2004

*Peter W. Heed*, attorney general (*David W. Ruoff*, assistant attorney general, on the brief and orally), for the State.

*Philip D. Cross*, of Portsmouth, by brief and orally, for the defendant.

DUGGAN, J. The defendant, Amanda Bortner, appeals her convictions in Superior Court (*T. Nadeau*, J.) on two class A misdemeanor counts of endangering the welfare of a child. *See* RSA 639:3, I (1996). We affirm.

The jury could have found the following facts. The defendant began dating Chad Evans in the summer of 2000. In September 2000, she and her nineteen-month-old daughter, Kassidy, moved in with Evans and his son, Kyle.

Shortly thereafter, bruises began appearing on Kassidy and she had difficulty walking. The defendant later told police that these bruises were caused by Evans. According to the defendant, Evans banged Kassidy's head into a closet door three times a week, grabbed Kassidy's face hard enough to leave bruises and held her head under running water to stop her from crying. Evans picked Kassidy up by her face or arm and threw her into a corner hard enough so that she hit her head. He also used his fingers to push down on her trachea until she gagged.

During the time that Evans was abusing Kassidy, the defendant concocted numerous stories to explain Kassidy's bruises. She told her friends and family that Kassidy bruised easily and that she hit her head on a coffee table. The defendant told another friend that Kassidy hit her head on a wall as Evans carried her down the stairs on his shoulders. To explain

a particularly noticeable bruise on Kassidy's face, the defendant told several people that Evans grabbed Kassidy by the face in order to keep her from falling off a trampoline. The defendant also explained that a mark on Kassidy's leg was the result of a mishap with a curling iron.

Between September and November 2000, the defendant became concerned that people who observed the bruises on Kassidy would think she was being abused. For this reason, the defendant did not take Kassidy to a doctor and sent her to a babysitter when Evans' parents visited. The defendant did not bring Kassidy to visit the defendant's mother when Kassidy had bruises on her face and did not put her into formal daycare. Instead, the defendant asked her sister, Jennifer Bortner, and her sister's boyfriend, Jeffrey Marshall, to watch Kassidy while she worked.

On November 8, 2000, the defendant dropped Kassidy off at her sister's and Marshall's home at around 2:00 p.m. Marshall watched Kassidy for about two hours and observed her acting normally. At around 5:00 p.m., Evans picked up Kassidy at Marshall's home. Approximately fifteen minutes after he left Marshall's home, however, Evans called Marshall and reported that Kassidy was acting "weird," explaining that Kassidy's eyes were rolling into the back of her head.

Marshall received two more phone calls from Evans that evening. The second time he called, Evans told Marshall that Kassidy fell "flat on her face" after she got out of his car. In his third call, Evans told Marshall that his son hit Kassidy in the face with a baseball. Again, Evans told Marshall that Kassidy's eyes were rolling into the back of her head but then said that she was "fine."

Marshall called Jennifer Bortner at work and described the phone calls he had received from Evans. Later that evening, the defendant visited Jennifer at her place of work. Jennifer told the defendant about the phone calls Marshall had received from Evans. The defendant called Evans, who told her that Kassidy's tongue was out of her mouth and her eyes were glazed over. When the defendant suggested bringing Kassidy to the doctor, Evans told her that they should wait until Kassidy's bruises healed. After speaking with Evans, the defendant told her sister that she was "sick of [her] f---ing kid constantly getting bruises at his house."

The next morning, the defendant noticed that Kassidy was very still and appeared to be having trouble staying awake. The defendant also observed that Kassidy had a mark under her right eye, redness and swelling around her left eye and some faded bruising around her mouth and chin.

Later that morning, the defendant dropped Kassidy off at her sister's and Marshall's home before going to work. As she brought Kassidy into the bedroom, the defendant commented, "Look at her face. It looks like

s---, doesn't it?" Jennifer and Marshall both testified that Kassidy's face was covered with bruises. The defendant and Jennifer left for work shortly thereafter.

Marshall put Kassidy in bed and turned on the television. At around noon, he checked on her and noticed that she was having trouble breathing. Marshall tried to administer CPR and called 911. A detective who arrived at the scene noted extensive bruising on Kassidy's face, chin and abdomen, as well as a cut on her index finger.

Kassidy was pronounced dead upon arrival at York County Hospital in York, Maine. The medical examiner later determined that Kassidy died from multiple blunt force injuries. In addition, the medical examiner found that several of Kassidy's bones were fractured and in various stages of the healing process. Specifically, the medical examiner documented fractures to Kassidy's left leg, both arms and her right hand.

Following Kassidy's death, the defendant was interviewed on four separate occasions by Detective Angela Blodgett of the Maine State Police. During the interviews, the defendant told Detective Blodgett that Evans threw Kassidy into a corner, banged her head on the closet door, pinched her face hard enough to leave bruises and called her a "bitch." The defendant admitted that she did not bring Kassidy to the doctor on the day before her death because she and Evans agreed to wait until Kassidy's bruises went away.

On December 19, 2000, the defendant was interviewed by New Hampshire State Police Sergeant James White. At this interview, the defendant described her observations of Kassidy on the day before her death and the day of her death. In addition, she described Evans as "out of control" when he was disciplining Kassidy. The information she provided to Sergeant White was, for the most part, consistent with the information she previously provided to Detective Blodgett.

On October 23, 2001, after Evans had been arrested for the murder of Kassidy, the State extended an offer of immunity to the defendant. In a letter sent to defense counsel, the State agreed not to prosecute the defendant for "any crimes" related to the death of Kassidy in exchange for Bortner's "cooperation" during the prosecution of Evans. The defendant reviewed the cooperation agreement with her counsel, signed it, and met with the State on November 5, 2001. After meeting with the defendant, however, the State refused to sign the cooperation agreement and charged her with two misdemeanor counts of endangering the welfare of a child. See RSA 639:3, I.

Evans was tried and convicted of reckless second-degree murder for the death of Kassidy. See State v. Evans, 150 N.H. 416 (2003). At Evans' trial,

the defendant testified for the State. She later filed a motion to dismiss the charges against her, arguing that because she complied with the terms of the cooperation agreement, the State could not prosecute her for any crimes related to Kassidy's death. The trial court found that the State reasonably determined that the defendant had breached the terms of the agreement and denied her motion to dismiss.

In November 2002, the defendant was convicted on both counts of endangering the welfare of a child. She was sentenced to two one-year consecutive terms in the house of corrections.

On appeal, she argues that: (1) the trial court should have enforced the cooperation agreement; (2) RSA 639:3, I, is unconstitutionally vague; and (3) the trial court's instructions to the jury were erroneous. We address each argument in turn.

The defendant first argues that the trial court should have enforced the cooperation agreement and dismissed the charges against her. Specifically, she argues that she did not breach the cooperation agreement because her minimizations and inconsistent statements were not material. Moreover, she contends that the trial court's finding that she gave inconsistent statements and minimized Evans' abuse of Kassidy was "irreconcilable with the court's previous determination in Evans' trial" that the testimony she gave before the jury was "primarily consistent" with the information she provided in prior interviews. We reject the defendant's arguments.

■ While we have not previously addressed the enforceability of an immunity agreement, both the State and the defendant agree that we should apply the principles developed in cases in which we were asked to determine the effect of a prosecutor's alleged breach of a plea bargain. *See State v. Little*, 138 N.H. 657 (1994); *State v. O'Leary*, 128 N.H. 661 (1986). In that context, we stated: "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Little*, 138 N.H. at 660 (quotation and brackets omitted) (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)). Furthermore, we recognized that "the most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining." *Id.* at 661 (quotation omitted). To determine whether the State violated the cooperation agreement in the present case, we "consider whether there was an agreement and, if so, its specific terms as [the defendant] reasonably understood them." *Id.* at 660.

Here, the cooperation agreement stated: "In consideration for [the defendant's] complete and truthful cooperation during the prosecution of

Chad Evans, and subject to the conditions set forth below, the State enters into the following agreement with [the defendant]." Accordingly, the State's promise not to prosecute the defendant was contingent upon the defendant complying with numerous obligations set forth in the agreement. In pertinent part, the agreement stated:

> [The defendant] must at all times provide information or testimony within the scope of this agreement that is truthful, candid, and complete. Making a material false statement or omission will constitute a breach of this agreement. In the event of such a breach, or any other breach of this agreement, the State of New Hampshire will be released from all its obligations hereunder and may initiate prosecution against [the defendant] for any crimes relating to the death of Kassidy Bortner or any injuries sustained by Kassidy Bortner before her death.

When she was interviewed by Detective Blodgett following Kassidy's death, the defendant described an incident in which an angry Evans held Kassidy's head under a faucet. When she was interviewed by the State in November 2001, the defendant altered her description of this incident. Specifically, the defendant described the incident as one in which Evans simply splashed water on Kassidy's face.

The defendant also told Detective Blodgett that Evans grabbed Kassidy by the back of the neck, tossed her into a corner and banged her head on the closet. The defendant minimized Evans' roughness when she was interviewed in November 2001.

Moreover, when she was interviewed by Detective Blodgett, the defendant explained that Kassidy had bruises on her face from Evans grabbing her face and pinching it when he disciplined her. When she was later interviewed in November 2001, however, the defendant "acknowledged that [Evans] grabbed Kassidy's face approximately 2 times a week but said that only on one occasion did this conduct cause bruising to Kassidy's face."

Finally, following Kassidy's death, the defendant told Sergeant White about a story she and Evans concocted to explain bruising on Kassidy's face. In an attempt to explain a prominent bruise, she told several people that Evans grabbed Kassidy by the face in order to keep her from falling off a trampoline. When she was asked about this incident in the November 2001 interview, the defendant said that "she did not know whether [the story] was true or false and would not characterize it as a lie."

Under the terms of the agreement, the defendant was obligated to provide information that was "truthful, candid, and complete." The

agreement further stated that the defendant would be in breach of the agreement if she made a material false statement or omission. The next sentence of the agreement stated that in the event of "such a breach, or any other breach of [the] agreement," the State would be released from its obligations.

■ As set forth above, when she was interviewed in November 2001, the defendant minimized Evans' behavior and provided information that was inconsistent with the information she had previously provided to both Detective Blodgett and Sergeant White. In short, the information she provided to the State was not "truthful, candid, and complete." Thus, we agree with the trial court that the defendant materially breached the terms of the cooperation agreement and the State was free to prosecute her.

During the Evans trial, the court ruled that the State could not use an expert to explain inconsistencies in the defendant's testimony because the testimony she gave before the jury was "primarily consistent" with the information she provided in the initial interviews. The defendant argues that this finding is irreconcilable with the State's argument that she breached the cooperation agreement. As set forth above, however, we conclude that the defendant had already breached the terms of the agreement when, well before the Evans trial, in the November 2001 interview, she provided information to the State that was inconsistent with the information she provided to both Detective Blodgett and Sergeant White. Thus, the defendant's subsequent testimony and the trial court's ruling in the Evans trial are of no consequence in determining whether she materially breached the agreement.

The defendant next argues that RSA 639:3, I, is unconstitutionally vague because its "inclusion of two distinct and incompatible *mens rea* does not provide a clear and ascertainable standard of criminal liability."

"Due process requires that a statute proscribing conduct not be so vague as to fail to provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *State v. Porelle*, 149 N.H. 420, 423 (2003) (quotation omitted). "Mathematical exactness is not required in a penal statute, nor is a law invalid merely because it could have been drafted with greater precision." *Id.* (quotation omitted). Moreover, "[t]he party challenging the statute as void for vagueness bears a heavy burden of proof in view of the strong presumption of a statute's constitutionality." *Id.* (quotation omitted). Because the constitutionality of a statute involves a question of law, we review the superior court's determination *de novo*. *Webster v. Town of Candia*, 146 N.H. 430, 434 (2001).

RSA 639:3, I, provides:

> A person is guilty of endangering the welfare of a child . . . if he knowingly endangers the welfare of a child under 18 years of age . . . by purposely violating a duty of care, protection or support he owes to such child . . . or by inducing such child . . . to engage in conduct that endangers his health or safety.

Thus, to violate RSA 639:3, I, a person must knowingly endanger the welfare of a child by purposely violating a duty of care, protection or support that the person owes to the child. *See* RSA 639:3, I. The defendant argues that the statute is impermissibly vague because it incorporates the two irreconcilable *mens rea* of knowingly and purposely. We disagree.

■ The statute is sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *See Webster*, 146 N.H. at 434. Contrary to the defendant's argument that the two *mens rea* in the statute are irreconcilable or incompatible, there are numerous ways in which a person can purposely fail to act without knowing it will endanger the welfare of a child. For example, a parent who fails to seek medical attention for a child who sprains a finger may have purposely violated a duty of care that the parent owes to the child. But, since a sprained finger is unlikely to cause death or serious injury, it is possible that the parent did not knowingly endanger the welfare of the child. On the other hand, a parent who fails to promptly seek medical attention for a child who stops breathing may have purposely violated a duty of care. In addition, the parent may have knowingly endangered the welfare of the child due to the high risk of death or serious injury that is likely to result. These examples demonstrate that the two separate *mens rea* of knowingly and purposely are not necessarily irreconcilable or incompatible. We thus conclude that the statute is sufficiently clear to warn the average person of the prohibited conduct and that the coexistence of purposely and knowingly in RSA 639:3, I, does not render the statute impermissibly vague.

Finally, the defendant argues that the trial court's instructions to the jury were erroneous. The defendant contends that the trial court confused the jury by instructing them that the defendant must act with two separate *mens rea* to be guilty of the crime of endangering the welfare of a child. The defendant additionally argues that the trial court erred because its instruction that the defendant must have acted both purposely and knowingly "directly contradicted" the court's earlier instruction regarding the general principles of criminal liability.

"The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. Frost*, 141 N.H. 493, 496 (1996) (quotation omitted). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *State v. Moses*, 143 N.H. 461, 462 (1999) (quotation omitted). "We determine if the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *Id.* (quotation omitted).

When it instructed the jury with regard to the general principles of criminal liability, the trial court stated:

> Now, the laws of New Hampshire set forth certain crimes. So if something is not defined in the Criminal Code, then it's not a crime. And each crime has a precise definition. The definition of each crime requires that the State prove both that the defendant committed certain acts and that she acted with a certain mental state. So crimes have at least two parts: An action and a mental state.

The court then explained the four specific elements of the crime of endangering the welfare of a child. When it defined the first element of the crime, the court said the State must prove "that the defendant acted knowingly. To prove [that] the defendant acted knowingly the State must prove that the defendant was aware that her actions or failure to act would endanger the welfare of Kassidy." The court further explained that:

> The State does not have to prove that the defendant specifically intended to commit the crime of endangering the welfare of a child or that she had a desire to do so. What the State must prove is that the defendant was aware her actions or failure to act would endanger the welfare of Kassidy.

With regard to the fourth element of the crime, purposely violating a duty of care or protection to Kassidy, the court said:

> This means the State must prove that the defendant had the conscious object to violate a duty of care or protection. The key words here are "conscious object." "Conscious object" means that the defendant had a specific intent to violate the duty of care or protection. It means the defendant desired to cause a certain result or to do the prohibited act. It is not enough for the State to

prove that the defendant knew or was aware of what she was doing. Nor is it enough for the State to prove that the defendant created a risk of injury or harm. To prove that the defendant acted purposely requires more than that. It requires proof that the defendant specifically intended or desired to violate a duty of care or protection.

■ Viewed in their entirety, the court's instructions adequately and accurately informed the jury of the applicable law, and would not leave a reasonable juror confused. *See id.* at 463. The court's introductory remarks could be reasonably understood as a general overview of criminal culpability. The court accurately explained to the jury that every crime must have an action and a mental state. The court did not tell the jury that a crime must have only one mental state. The court then instructed the jury about the specific elements of the crime, using language that tracked RSA 639:3, I. The court's instructions adequately and accurately explained each element of the offense. Moreover, as set forth above, we are unconvinced that RSA 639:3, I, was confusing to the jury because it incorporates two *mens rea*. Because the trial court's instructions provided the jury with a clear and intelligible description of the applicable law in this case, we conclude that the instructions were not erroneous. *See Frost*, 141 N.H. at 496.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, J., concurred.