Hillsborough-southern judicial district
No. 2005-191

CLAIRE BERTHIAUME & a.

v.

JOHN B. McCORMACK, THE ROMAN CATHOLIC BISHOP OF MANCHESTER, A CORPORATION SOLE

Argued: October 19, 2005
Opinion Issued: February 14, 2006

*Law Offices of Randall E. Wilbert*, of Nashua (*Randall E. Wilbert* and *Mary Lynn Roedel* on the brief, and *Mr. Wilbert* orally), for the petitioners.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Ovide M. Lamontagne* and *Jonathan M. Shirley* on the brief, and *Mr. Lamontagne* orally), for the respondent.

BRODERICK, C.J. The petitioners, Claire Berthiaume, Robert Daigle, Jeanne Daigle, Theresa Santerre, Rita Bonner, Francis J. Bonner, John C. Kent, Paula Kent, Edward A. Vitagliano, and Theresa A. Vitagliano, members of the former St. Francis Xavier parish (St. Francis Xavier) of the Roman Catholic Church in Nashua, appeal the order of the Superior Court (*Groff*, J.) dismissing their claims against the respondent, John B. McCormack (Bishop McCormack), in his capacity as the Roman Catholic Bishop of Manchester, a corporation sole (RCBM). We affirm.

## I

The record supports the following. In 1885, St. Francis Xavier was founded by the Diocese of Manchester. In July of that year, the Jackson Company, a textile manufacturer, deeded certain land in Nashua to the Bishop of Manchester, Denis Bradley. The conveyance was made upon three express conditions contained in the deed: (1) that the Bishop build "a substantial church edifice suited to public religious use" within two years of the conveyance; (2) that if that church were destroyed by a fire or otherwise, the Bishop rebuild "a like church edifice designed for a similar purpose" within three years; and (3) that the land always "be used and occupied as a place of public religious resort and for public religious and

pious uses and purposes, and never for any other use or purpose whatever." The deed provided that, upon default of any of the conditions, the land would "immediately revert to [the] Jackson Co. its successors or assigns."

To make clear that this and other property was owned by the Manchester Diocese of the Roman Catholic Church and not by Bishop Bradley personally, the legislature created the Roman Catholic Bishop of Manchester as a corporation sole. Laws 1901, ch. 232. The statute created the RCBM's powers and responsibilities with respect to property that had been conveyed to Bishop Bradley or would subsequently be conveyed to the Diocese of Manchester or its parishes. Id.

In May 1886, a small brick chapel and wood frame rectory were built on the property conveyed by the Jackson Company, and in 1889, the present St. Francis Xavier church was completed. From the founding of St. Francis Xavier until 1918, the parish's debts were paid through donations from its parishioners. Between 1918 and 1920, a school and a convent were constructed on the property. The parishioners continued to make donations, and in 1945, they paid off the construction debt on both structures. These five buildings and the land on which they sit are the subject of this litigation.

In 2001, Bishop McCormack formed a task force to study ways for the Roman Catholic Church to fulfill its mission in Nashua while also managing its resources in the face of a declining number of priests and inner city parishioners. On March 1, 2003, consistent with the task force recommendations, Bishop McCormack decreed that the parishes of St. Stanislaus, St. Francis Xavier, and St. Aloysius of Gonzaga would be united to form one territorial parish. In doing so, he suppressed the parishes of St. Stanislaus and St. Francis Xavier, and designated the St. Aloysius of Gonzaga church as the place of worship for the three united parish communities. The St. Francis Xavier church was closed in March 2003, and all items of religious value and significance were removed by the diocese and transferred to the newly expanded St. Aloysius of Gonzaga parish. At the time the three parishes were unified, the petitioners were members of St. Francis Xavier.

In November 2002, the St. Francis Xavier Church Foundation (Foundation) was organized by St. Francis Xavier parishioners, including some of the petitioners, for the purpose of receiving a conveyance of the land and buildings at issue, or the ability to operate and to manage them. In February 2004, the Foundation proposed to purchase the land and buildings for $17,901.11, the amount of the outstanding real estate taxes owed to the City of Nashua. The RCBM, however, decided to sell the property to someone else. In April 2004, the Foundation and four of the

petitioners filed suit in the superior court seeking to prohibit a sale of the property. The Foundation was subsequently removed as a petitioner and the remaining six petitioners were joined.

During the pendency of that litigation, the RCBM signed a purchase and sale agreement for the land and buildings with an individual who agreed to give the property to the Armenian Orthodox Church. The purchaser agreed to pay $1,000,000 and the Armenian Orthodox Church agreed to continue to use the property for public religious purposes as required by the original 1885 deed. The RCBM then filed suit in the Hillsborough County Probate Court requesting a ruling that the proposed sale was permitted by the 1885 deed restrictions. Pending a ruling, the superior court proceedings were stayed.

The petitioners attempted to intervene in the probate court, making various arguments why the proposed sale should not be allowed. The RCBM both objected to the intervention and responded to the petitioners' substantive arguments. The probate court subsequently ruled that the petitioners lacked standing and accordingly denied their motion. No appeal was taken. After the Jackson Company's successor and the Attorney General, as director of charitable trusts, assented to the sale of the property, the probate court issued the RCBM's requested ruling, allowing the sale to proceed.

With the probate court matter resolved, the superior court lifted the stay and addressed the petitioners' action. First, the petitioners contended that Laws 1901, chapter 232 (chapter 232), which created the RCBM, established a statutory trust that obligated the RCBM to hold St. Francis Xavier property in trust for the use and benefit of its parishioners. Second, they argued that the restrictions in the 1885 deed were in full force and effect and prohibited the RCBM from "conveying the church for a non-religious use." Third, they alleged that, "[b]y paying for the construction of the parish church and by the contributions made by the St. Francis Xavier parishioners to the parish and to the Diocese of Manchester, the Diocese [had] a confidential and fiduciary relationship with the St. Francis Xavier parishioners." They further argued that by closing the St. Francis Xavier church and selling the land and buildings, the Diocese breached its fiduciary duty and would be unjustly enriched. Accordingly, they petitioned the superior court to impose a constructive trust upon the RCBM with the St. Francis Xavier parishioners as beneficiaries, and to either prohibit the sale of the land and buildings and order their continued maintenance, or to order the RCBM to deed to the Foundation "all title, right and interest to the real estate."

The RCBM moved to dismiss, arguing that the enforcement of the 1885 deed restrictions was within the exclusive jurisdiction of the probate court,

and that in any event the petitioners did not have standing to enforce the deed's provisions. The RCBM further argued that the First Amendment to the Federal Constitution prohibited courts from examining church doctrines and policies, and that the superior court could not resolve this litigation without violating that Amendment because the dispute involved the reorganization of parishes and redistribution of their property. Finally, the RCBM argued that the petitioners had not alleged sufficient facts to support a claim for a constructive trust.

The superior court granted the motion to dismiss. On the petitioners' first claim, it ruled that the statute creating the RCBM as a corporation sole also created a statutory trust with the parishioners as beneficiaries, and thus the superior court had jurisdiction to hear the case. However, the superior court ruled that, "to the extent[] the petitioners [sought] to challenge the Bishop's right to suppress the St. Francis Xavier Parish and to unite it with the two other parishes, and to determine whether that conduct [was] a breach of the Bishop's fiduciary duty to the members of the parish," the First Amendment would prohibit it from taking jurisdiction.

On the petitioners' second claim, that the 1885 deed restrictions prohibited the sale of the property, the superior court held that, although "the petitioners could seek to prevent [a sale in violation of the deed's provisions] by virtue of their status as beneficiaries under the statutory trust," it concluded that the probate court proceedings were *"res judicata* in regard to that issue." Further, it ruled that any claim that the proceeds of the sale would be misused was premature as the sale had not yet been completed and there were no funds available, let alone available for a purpose other than for the benefit of the three unified parishes.

On the final claim requesting imposition of a constructive trust, the superior court determined that, "even were the Court to find that the petitioners met the requirements for the imposition of a constructive trust, there is no basis for [its] imposition ... because an actual statutory trust exists." It also ruled that the same First Amendment restrictions that applied to a statutory trust also applied to a constructive one. Having thus resolved each claim against the petitioners, the superior court dismissed the petition. This appeal followed.

The petitioners appeal only their first and second claims. As to the statutory trust, they argue that by attempting to sell the property, the RCBM violated its duties and powers as trustee of parish property as defined in both the statute designating the RCBM as a corporation sole, Laws 1901, ch. 232, and the Uniform Trust Code, *see* RSA 564-B:8-801 to :8-817 (Supp. 2005). They also contend that the First Amendment does not prohibit adjudication of their claims, arguing that the United States

Supreme Court has allowed a neutral principles test to give courts the ability to resolve property disputes involving churches. For its part, the RCBM makes substantially the same arguments on appeal as it did in the trial court.

As to whether the probate court proceedings were res judicata on their claim that the RCBM was prohibited from conveying the property for a nonreligious purpose, the petitioners argue that the issues in the probate and superior court actions were not identical. They further argue that, because they were denied standing to intervene in the probate court, they cannot be bound by its determination in the superior court. The RCBM argues that the probate court properly determined that the petitioners did not have standing, that the Attorney General as director of charitable trusts represented any interest they might have had, and that by not appealing the probate court ruling, the petitioners lost their right to challenge it.

## II

We begin our review of the issues with a discussion of the proper standard of review. The superior court disposed of this case by granting the RCBM's motion to dismiss.

> In reviewing the trial court's grant of a motion to dismiss, our task is to ascertain whether the allegations pleaded in the plaintiff's writ are reasonably susceptible of a construction that would permit recovery. We assume all facts pleaded in the plaintiff's writ are true, and we construe all reasonable inferences drawn from those facts in the plaintiff's favor. We then engage in a threshold inquiry that tests the facts in the complaint against the applicable law.

*Berry v. Watchtower Bible & Tract Soc.*, 152 N.H. 407, 410 (2005) (quotations and citations omitted). The issues raised by the petitioners involve questions of law that are reviewed *de novo. See Motion Motors v. Berwick*, 150 N.H. 771, 775 (2004) (interpretation of deed is question of law); *Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005) (interpretation of statute is question of law); *State v. Bortner*, 150 N.H. 504, 510 (2004) (constitutionality of statute is question of law); *Innie v. W & R, Inc.*, 116 N.H. 315, 315-16 (1976) (applicability of res judicata is question of law).

We first address whether the First Amendment allows courts to review, if at all, issues raised when a church is involved in a dispute over its property. "The State has an obvious and legitimate interest in the peaceful

resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). "Special problems arise, however, when these disputes implicate controversies over church doctrine and practice." *Presbyterian Church v. Hull Church*, 393 U.S. 440, 445 (1969). It is for these reasons that courts must carefully examine disputes that involve religious organizations. *See id.* at 449. As the United States Supreme Court has noted:

> Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.

*Id.* Thus, in order to decide whether the superior court too narrowly construed its jurisdiction in this case, we must determine whether it could resolve the property dispute brought about by Bishop McCormack's suppression of the parishes without entangling itself in matters of doctrine, discipline, faith, or internal organization of the Roman Catholic Church. *See id.*; *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976); *Md. & Va. Churches v. Sharpsburg Ch.*, 396 U.S. 367, 368 (1970) (per curiam); *Jones*, 443 U.S. at 602.

In *Jones*, the Supreme Court outlined various advantages associated with the neutral principles approach to property disputes involving churches. "The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones*, 443 U.S. at 603. It then held "that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* at 604. It did not, however, *require* that such a test be adopted or that the test as articulated in *Jones* be the definitive manner in which a neutral principles analysis must occur. *Id.* at 602.

Some States have adopted the neutral principles test as articulated in *Jones*. Relying upon *Jones*, the Massachusetts Supreme Judicial Court has

stated, "Under the 'neutral principles of law' analysis, as long as a State court's resolution of a church property dispute involves no inquiry into religious doctrine, the court may examine such sources as (a) statutory provisions governing the holding of property by religious corporations; (b) the constitutions and by-laws of the religious organizations involved, especially in so far as they pertain to the ownership and control of church property; and (c) the deeds to the property in question." *Antioch Temple, Inc. v. Parekh*, 422 N.E.2d 1337, 1345-46 (Mass. 1981), *overruled in part by Callahan v. First Congregational Church*, 808 N.E.2d 301, 306-09 (Mass. 2004). That court went on to state that, "as a matter of Federal constitutional law," courts need not necessarily defer to the rulings of church tribunals on matters of property disputes. *See id.* at 1346.

Although the petitioners do not articulate what deference, if any, should be given to a church's own interpretation of its governing documents, they urge us to join Massachusetts in adopting the neutral principles test as articulated in *Antioch Temple*. The petitioners read the Canon Law of the Roman Catholic Church as defining certain obligations that bishops and priests owe to parishes and parishioners, as defining whether Church property may be sold, and as requiring that the Church defer to civil courts on disputes over Church property. The RCBM, on the other hand, argues that Canon Law gave Bishop McCormack authority to suppress St. Francis Xavier, as well as to sell the property in question. The RCBM further contends that these actions, particularly the suppression of the parishes and the transfers of property from them to the new, unified St. Aloysius of Gonzaga parish, may not be reviewed by a civil court.

We recognize that the United States Supreme Court in *Jones* approved of the test put forth by the petitioners. However, as noted, that Court explicitly stated that the First Amendment does not mandate such a test. Indeed, it recognized the problems that may arise when civil courts are required "to examine certain religious documents, such as a church constitution." *Jones*, 443 U.S. at 604. But instead of prohibiting courts from examining church documents, the Supreme Court merely advised courts to "take special care to scrutinize [them] in purely secular terms, and not to rely on religious precepts in determining whether [they indicate] that the parties have intended to create a trust." *Id.* The four dissenting justices in *Jones* observed, "The constitutional documents of churches tend to be drawn in terms of religious precepts. Attempting to read them 'in purely secular terms' is more likely to promote confusion than understanding." *Id.* at 612 (Powell, J., dissenting). The dissent explained the problems that could arise if the church's governing documents do not contain any provisions describing church property and the polity governing such property. *Id.* at 612-13. Rather than try to

interpret such documents, the dissent concluded that the better rule was that of deference adopted by the Supreme Court in *Watson v. Jones*, 80 U.S. 679 (1871). *Id.* at 610-20.

In *Watson*, the Court stated that "[r]eligious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." *Id.* at 714. Accordingly, the Court held that the law of voluntary associations should govern internal disputes over church property: if the church is congregational, a majority of members would govern; but if it were hierarchical, the court would defer to the decision of the hierarchy. *Id.* at 725. The Court explained why a deferential rule should govern the interpretation of church documents:

> All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 729.

Because the *Watson* rule of deference has subsequently been reaffirmed several times, *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 110-16 (1952); *Presbyterian Church*, 393 U.S. at 447-48; *Serbian Orthodox Diocese*, 426 U.S. at 710-15, the *Jones* dissent concluded that it should govern that case. *Jones*, 443 U.S. at 616-20 (Powell, J., dissenting). The majority, however, believed that under the dissent's reading of *Watson*,

> civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous .... In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity."

*Id.* at 605 (quoting *Serbian Orthodox Diocese*, 426 U.S. at 723). For this reason, it did not require "a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of

doctrinal controversy is involved." *Id.* Thus, it allowed courts to consider secular documents such as deeds and trusts in addition to church documents.

Although we adopted a neutral principles test in *Reardon v. Lemoyne*, 122 N.H. 1042 (1982), we did not define what kinds of documents we would consider in applying it. There, the superintendent of schools for the Diocese of Manchester notified four nuns working as teachers and the principal of a parochial school that he was recommending that the school board not rehire them. Believing they were improperly dismissed, the nuns filed suit in the superior court requesting that the court construe their employment contracts. *Reardon*, 122 N.H. at 1045-46.

Applying a neutral principles test, we resolved that dispute simply by examining the employment contracts just as we would have in any other employment case. *Id.* at 1048-50. As Chief Justice King noted in his special concurrence, "[T]his is basically a simple case of an alleged breach of contract." *Id.* at 1051 (King, C.J., concurring specially). Accordingly, we had no need to examine the Canon Law of the Roman Catholic Church, or any other religious document or pronouncement that might involve doctrine or policy.

■ In light of these cases, and due to the fact that the Supreme Court has left it to the States to "adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters," *Jones*, 443 U.S. at 602 (quotation omitted), we will first consider only secular documents such as trusts, deeds, and statutes. Only if these documents leave it unclear which party should prevail will we consider religious documents, such as church constitutions and by-laws, even when such documents contain provisions governing the use or disposal of church property. We reserve our opinion as to what level of deference should be given to church pronouncements regarding the proper interpretation of those documents.

This holding is consistent with our rules governing the resolution of property disputes generally. In resolving such disputes, we consider extrinsic evidence and the circumstances surrounding a conveyance to determine the parties' intent only if the language of the relevant documents contains either patent or latent ambiguity. *See Flanagan v. Prudhomme*, 138 N.H. 561, 566 (1994); *Quality Discount Market Corp. v. Laconia Planning Bd.*, 132 N.H. 734, 740 (1990). Our holding also properly reflects the statement of the Supreme Court in *Watson* when it stated:

> It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their

own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

*Watson*, 80 U.S. at 729. Although the Supreme Court has since held that we may consider religious documents, where it did not require such a result, we choose to avoid any perception of entanglement, where possible.

### III

Having outlined the contours of our neutral principles test, we now turn to the interpretation of the statutes and deeds involved. The petitioners argue that section 6 of chapter 232 governs the RCBM's rights and responsibilities with respect to the land and buildings at issue:

> It is also hereby provided that [the RCBM] shall be regarded as holding, in trust, the property of each parish, in said diocese, for the use and benefit of the members of such parish; and [the RCBM] shall not convey by mortgage, or otherwise pledge, the property of any parish for the debts, or other obligations, of any other parish within the diocese; the property of each parish thereof to be only liable and subject to a mortgage or pledge to secure or satisfy debts and obligations incurred and created for the use and benefit of such parish.

The petitioners argue that the land and buildings were the property of St. Francis Xavier, and therefore the RCBM had a duty to hold them in trust for the benefit of the parishioners.

We agree that the plain language of the statute demonstrates that parish property must be held for the use and benefit of the parish and its parishioners. Thus, the issue before us is whether the land and buildings at issue here are parish property. To determine this we must consider the 1885 deed and other provisions of chapter 232.

The deed conveys the land to "Dennis [*sic*] M. Bradley, Bishop of Manchester." Section 5 of chapter 232 states, in relevant part:

> All gifts, grants, deeds, and conveyances, and also all devises and bequests heretofore made, of property within this state, to ... Denis M. Bradley, Bishop of Manchester ... shall be construed, unless the contrary clearly appears from the instrument, when the terms of it and the limitations thereof shall prevail, as conveying, giving, granting, devising, or bequeathing the property in such instrument mentioned *to the Roman Catholic Bishop of Manchester* ... subject to any trust expressed

in any said instrument, and to any limitations governing said trust.

(Emphasis added.) Section 6 then immediately begins, "It is *also* hereby provided" that the RCBM holds "in trust, *the property of each parish.*" (Emphasis added.) The plain language of the statute defines two different types of property—property of the RCBM and property of individual parishes. Both are subject to the limitations contained in section 2 of chapter 232 as well as any trust expressed in any instrument of conveyance. However, parish property has the additional limitation of being used for the express benefit of the parish and its parishioners.

■ Where the 1885 deed expressly conveyed the property at issue to Bishop Bradley, and not to the St. Francis Xavier parish, we hold that the land and buildings qualify as section 5 property and not section 6 property. Section 5 expressly makes property thus conveyed that of the RCBM "unless the contrary clearly appears from the instrument." We find nothing on the face of the deed or in the record to suggest that the property was conveyed to the parish directly, or by Bishop Bradley or any of his successors as RCBM to St. Francis Xavier, nor have the petitioners alleged any such conveyance or interpretation of the deed. Indeed, in RSA 306:7 (2005) the legislature has determined:

> No conveyance of the lands of a church shall be effectual to pass the same if made by the trustees or deacons without the consent of the church, or a committee of the church appointed for that purpose, or if made by the church wardens without the consent of the vestry.

*See also* RSA 306:3 (2005) ("If a donation, gift or grant is made to any unincorporated religious society, such society shall be a corporation so far as may be necessary to take, hold, manage and use the donation, gift or grant . . . ."); RSA 306:4 (2005) (recognizing "trustees, deacons, church wardens or other similar officers of churches or religious societies" as "bodies corporate for the purpose of taking and holding in succession grants and donations, whether of real or personal estate, made either to them and their successors, or to their respective churches, or to the poor of their churches"). The petitioners have not alleged that these requirements were met in order to convey the land and buildings from the RCBM to St. Francis Xavier. Nor do they allege that these requirements were not met by the sale of the property from the RCBM to the individual who would give it to the Armenian Orthodox Church.

We recognize that the RCBM as well as the parishioners refer to the land and buildings as St. Francis Xavier property. That notwithstanding,

title to land is defined, not by the parties to a dispute, but by the deeds and statutes as interpreted by this court. Having performed *de novo* review of these documents, we hold that the 1885 deed conveyed this property to the RCBM, and not to St. Francis Xavier. We also note that, although it did not provide its reasoning, the probate court reached the same conclusion when it ruled "that the RCBM holds legal title [to the land in question] for the Diocese of Manchester."

This is not to say that the petitioners have no recourse under chapter 232. Because they are members of the Manchester Diocese, we hold that the petitioners have standing to ensure that the RCBM properly exercises its duties and powers with respect to RCBM property. Section 2 defines those powers:

> [The RCBM] shall be empowered to receive, take, and hold, by sale gift, lease, devise, or otherwise, real and personal estate of every description, . . . and to manage and dispose of the same for the religious, charitable, educational, and burial purposes of the Roman Catholic church, subject to the laws of this state and to the terms of any trust set forth in any bequest, devise, deed, or conveyance of any such estate, . . . with such limitations as may by law govern any such trust, with full power, subject to the laws of this state and to the terms of such trusts, to convey the said estate by deed absolute, or by mortgage to secure payment of money.

The petitioners seek to prohibit the sale of the property as a violation of the RCBM's powers under chapter 232. Section 2, however, expressly gives the RCBM the power to "manage *and dispose* of [RCBM property] for the religious, charitable, educational, and burial purposes of the Roman Catholic [C]hurch." (Emphasis added.) The petitioners do not argue that the RCBM has acted contrary to the interests of the Roman Catholic Church, but only against their interests as parishioners of St. Francis Xavier.

Our holding that the land and buildings at issue here are the property of the RCBM and not St. Francis Xavier is consistent with our interpretation of chapter 232 in *Akscyn v. Bank*, 78 N.H. 196 (1916). There, a foundation had been established to raise money in trust for the purpose of "the securing of church accommodations for [a] Lithuanian Catholic congregation." *Akscyn*, 78 N.H. at 199. The funds were then donated to the RCBM, and an allegation arose that they had not been used for the intended purpose. We stated:

> It is claimed the money, or portions of it, was given upon the trust or condition that it was to be used only for the purchase of a church building, *the title to which*, when paid for, should be in the name of the St. Cassimer Roman Catholic Society of Nashua. If this be so, it is apparent that neither the committee, the society nor the bishop are [*sic*] authorized to use the money for another purpose.

*Id.* at 200 (emphasis added). While the issue there was slightly different from here, both cases turn on whether title to land and buildings purchased with donated funds should have been in the name of an entity other than the RCBM.

The petitioners urge us to consider the fact that donations were made by St. Francis Xavier parishioners to the parish and the Manchester Diocese in order to pay for the buildings at issue. We read their arguments as stating that the buildings are St. Francis Xavier property, and thus governed by section 6 of chapter 232 and not section 5. However, there is no evidence that the donations, although clearly marked for a specific use, were to pay for buildings on the condition that they become property of the parish rather than that of the RCBM. Indeed, the 1885 deed itself specifically references that a church be built as a condition of the transfer to Bishop Bradley.

■ Section 5 of chapter 232 makes clear that such a conveyance is to the RCBM and not to St. Francis Xavier. Furthermore, there are no allegations that title to the land and buildings is in separate entities. We therefore hold that the buildings, like the land, belong to the RCBM and not to the parish under section 6 of chapter 232.

We reach the same result analyzing the RCBM's responsibilities as defined under article 8 of RSA chapter 564-B. Trustees are required to "administer, invest and manage the trust and distribute the trust property in good faith, in accordance with [the trust's] terms and purposes and the interests of the beneficiaries, and in accordance with this chapter." RSA 564-B:8-801. The petitioners point to nothing in the Uniform Trust Code that would prohibit a sale of the property, so long as the proceeds are used for the benefit of the Roman Catholic Church. Section 8-801 of RSA chapter 564-B authorizes a trustee to manage trust property in accordance with the trust's terms, and as discussed above, section 2 of chapter 232 expressly allows the disposal of RCBM property.

■ We need not define the precise scope of the RCBM's duties. We simply hold that the proposed sale of the land and buildings in this case

does not constitute a violation of the RCBM's duties under either chapter 232 or article 8 of RSA chapter 564-B.

Although the superior court appears to have considered the Canon Law in making its decision, we reach the same conclusion. Having engaged in *de novo* review of the applicability of the First Amendment, as well as the interpretations of the statutes and deed, we now turn to the superior court's grant of the motion to dismiss. Assuming the truth of all facts contained in the writ, and construing all reasonable inferences from them in favor of the petitioners, *see Berry*, 152 N.H. at 410, we hold that the motion to dismiss was properly granted. Accordingly, we affirm the dismissal by the superior court as it relates to the statutory trust and the RCBM's duties as trustee.

As the petitioners do not appeal whether facts in the writ support a claim that the monetary donations created a separate, constructive trust that would give them the relief they seek, we do not address that issue.

## IV

■ The final issue is whether res judicata bars the petitioners' claims that the restrictions of the 1885 deed should be construed to prohibit the proposed sale. The essence of the doctrine of res judicata is that a final judgment by a court of competent jurisdiction is conclusive upon the parties in a subsequent litigation involving the same cause of action. *Eastern Marine Const. Corp. v. First Southern Leasing*, 129 N.H. 270, 273 (1987).

On appeal, the petitioners argue first that the causes of action in the superior and probate courts were not identical. The petitioners claim:

> The issue of the deed restrictions was not an argument raised by the appellants in their Petition for Declaratory Judgment and therefore, it was not before the Superior Court. Rather, the appellants sought a ruling from the Superior Court on whether the RCBM as trustee of the statutory trust created by New Hampshire Laws 1901 was violating its fiduciary duties to the beneficiaries of the trust by selling the St. Francis property.

(Citation omitted.) We disagree. In paragraphs 36 and 37 of their petition, the petitioners declared:

> The [1885] deed by the Jackson Company ... contain[s] restrictions on the use of the property.
>
> By this Petition, the petitioners are requesting the Court to determine that said restrictions are in full force and effect and

thereby limit the respondents from conveying the church for a nonreligious use.

This was exactly the issue before the probate court. That the petitioners were *also* arguing that the RCBM violated its duties as trustee does not change the fact that they petitioned the superior court for a determination that the 1885 deed restrictions prohibited the proposed sale of the property.

The petitioners next argue that, even if the claims to enforce the 1885 deed restrictions were the same in both cases, preclusion cannot take effect as they were denied standing in the probate court action and therefore were not parties to that case. We need not reach that issue, however, because by asking the superior court to enforce the deed restrictions, and then attempting to intervene in the probate court matter, the petitioners raised the issue of their standing to enforce the deed restrictions in both the superior and probate courts. Thus the issue precluded is whether the petitioners had standing to litigate issues related to the deed restrictions, something challenged by the RCBM in both actions.

■ The probate court held that the petitioners did not have standing to enforce the 1885 deed restrictions. This ruling was made after the parties argued the merits of the standing issue, and the petitioners chose not to challenge that determination on appeal. The same parties then reargued the question of the petitioners' standing to enforce the deed restrictions in the superior court. Given that the parties and the standing issue were identical, and that the probate court proceeding had reached finality on the issue of the petitioners' standing, we hold that the petitioners were precluded from raising claims regarding the enforcement of the deed restrictions in the superior court.

We make no statements as to the propriety of the probate court determination, as the petitioners did not appeal the denial of standing in that case. Our holding here simply recognizes that, having litigated that issue in the probate court and lost, the petitioners are barred from bringing the action again in the superior court. Although we would apply res judicata to a slightly different issue than the superior court, we reach the same result with respect to the petitioners' second claim. Accordingly, we affirm on that issue as well.

*Affirmed.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.