NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Nashua Family Division
No. 2016-0269

IN RE N.K.

Argued: November 17, 2016
Opinion Issued: December 23, 2016

Joseph A. Foster, attorney general (Elizabeth C. Woodcock, assistant attorney general, on the brief and orally), for the State.

Christine C. List, assistant appellate defender, of Concord, on the brief and orally, for the juvenile.

HICKS, J. The juvenile, N.K., appeals the Circuit Court's (Leary, J.) finding of delinquency based upon a petition alleging that he had endangered the welfare of a child. See RSA 639:3, I (2016). He argues that there was insufficient evidence to support the trial court's finding that he knowingly endangered the child's welfare by purposely violating a duty of care he owed to the child. See id. We affirm.

I. Background

Viewing the evidence presented at the adjudicatory delinquency hearing in the light most favorable to the State, see In re D.B., 164 N.H. 46, 48 (2012), the trial court could find the following facts. The juvenile's mother works the overnight shift as a nurse's aide, and regularly leaves the juvenile in charge of

his younger brother while she is at work.  The juvenile's mother testified that the younger brother "sleeps very well at night, so he usually doesn't wake up" while she is gone.

At approximately 10:45 p.m. on February 20, 2016, the juvenile's mother left the juvenile, then sixteen years old, and the juvenile's brother, then four years old, alone at the family's apartment in Nashua.  She testified that, when walking to her vehicle, she observed a car containing "a few . . . young teenagers" pull into the area.  She then went back inside the apartment to tell the juvenile that he was not to have anyone in the house while she was gone. She told him that if there were people in the house when she came home, she would have them arrested.  She then went to work.

A few hours later, the juvenile's mother came back to the apartment to check on the juvenile and his brother.  According to her testimony, when she returned home, she observed several "young teenagers" swiftly exiting the apartment.  When she went inside, the residence was "full of smoke" and "smell[ed] like marijuana," and there were empty beer cans in the living room. She believed that the juvenile was "drunk and probably high."  Concerned for the safety of her younger son, she went to check on him.  The child was still asleep in the bedroom—next to the living room—where she had left him before leaving for work.

Consistent with her earlier warning, the juvenile's mother called the police.  Officers Fitzpatrick and Reinold of the Nashua Police Department responded to the call.  When they arrived at the family's apartment, the juvenile's mother invited the officers inside.

According to Fitzpatrick's testimony, upon entering, he observed that the apartment, which is approximately 600 square feet in size, "was very densely littered with the smell of freshly burnt marijuana and alcoholic beverages." Reinold testified that he noticed that the burnt marijuana smell was "quite strong" and that it permeated the apartment.  In the kitchen, the officers observed that the floor was sticky and wet with what appeared to be beer. They also observed beer cans in the sink, on the kitchen countertops, on the floor, and in the living room.  Fitzpatrick testified that ashes were "littered throughout the countertops, the rug flooring of the apartment, the kitchen area, the kitchen sink area, [and] the kitchen linoleum flooring."  He observed an empty pack of cigarettes, and "two clear glassine baggies that had the distinct smell of unburnt marijuana."  He also observed two empty packs of cigars and some loose tobacco.  Based on his training and experience, Fitzpatrick believed that the teenagers had hollowed out the cigars and used the wrappers to smoke marijuana.

Fitzpatrick then asked the juvenile's mother whether there was any other indication that the juvenile had hosted an underage drinking party.  She

2

directed his attention to a closet, which contained an empty 30-pack of beer, an empty bottle of pineapple vodka, and an unlabeled prescription bottle containing tinfoil. When he opened the prescription bottle, Fitzpatrick was "overwhelmed with the smell of marijuana."

The officers attempted to speak with the juvenile, who was seated on the couch in the living room. Based on the juvenile's appearance and behavior, both officers believed that the juvenile was under the influence of alcohol and marijuana. According to Reinold, the juvenile had "[m]umbling, slurring speech." Fitzpatrick testified that the juvenile's "posture was kind of slouched down" and that he "wouldn't really lift his head . . . towards [the officers] to speak with [them]." According to the officers' testimony, the juvenile's eyes were "red, glassy," "droopy," and bloodshot. The officers asked the juvenile if he could look up at them, and, according to Fitzpatrick, the juvenile "wasn't able to do [so]." Additionally, Reinold testified that, in response to the officers' questions, the juvenile "mostly just kept saying 'no, no, no.'" (Internal quotation marks added.) However, at one point, the juvenile said, "'I don't know how any of this stuff got here, no idea.'"

Reinold then spoke with the juvenile's mother in the bedroom. He observed that the child was asleep in the bed. Although there were no beer cans or any other illegal substances visible within the bedroom, Reinold observed that the bedroom "smell[ed] of marijuana."

The juvenile's mother informed Reinold that the juvenile had been in charge of caring for the child. Because of the juvenile's impairment, neither of the officers would have left the juvenile alone at the apartment. Additionally, neither officer believed that the juvenile was capable of caring for another person in his current state. Accordingly, Reinold placed the juvenile under arrest.

The juvenile was charged with endangering the welfare of his younger brother in violation of RSA 639:3, I. The delinquency petition alleged that he "did knowingly endanger the welfare of [his brother], a child under the age of eighteen, by purposely violating a duty of care which he owed to him in that he smoked marijuana and consumed alcohol and said defendant being his brother having custody of the child at the time." The trial court held an adjudicatory delinquency hearing on April 11, 2016, at which the juvenile's mother, Fitzpatrick, and Reinold testified. After the hearing, the juvenile moved to dismiss the petition based on insufficiency of the evidence. The trial court denied the motion and found the juvenile delinquent. This appeal followed.

II. Analysis

On appeal, the juvenile argues that the evidence at the hearing was insufficient to prove: (1) that he violated a duty of care owed to his brother; and

3

(2) that he endangered his brother's welfare. "A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo." State v. Collyns, 166 N.H. 514, 517 (2014). "In challenging the sufficiency of the evidence, the juvenile must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." In re D.B., 164 N.H. at 48 (quotation omitted).

Pursuant to RSA 639:3, I, a person is guilty of endangering the welfare of a child if he "knowingly endangers the welfare of a child under 18 years of age . . . by purposely violating a duty of care, protection or support he owes to such child." RSA 639:3, I. Thus, in the instant case, the State was required to prove: (1) that the juvenile knowingly endangered the welfare of his brother; and (2) that he did so by purposely violating a duty of care owed to him. See id.; see also State v. Bortner, 150 N.H. 504, 511 (2004).

The juvenile concedes that he owed his brother a duty of care. However, according to the juvenile, his duty of care required only that he keep his brother safe, and "[t]here is no evidence that [he] failed to fulfill this duty." He contends that "the State failed to prove that [his] judgment, though arguably compromised by intoxication, was not up to the challenge of protecting [his brother]." Because the State does not argue otherwise, we assume, without deciding, that where, as here, impairment forms the sole basis of the alleged violation of duty, RSA 639:3, I, requires the State to prove that the person charged was not capable of caring for the child.

Considering the evidence presented at the hearing in the light most favorable to the State, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the juvenile violated the duty of care owed to his brother. Contrary to the juvenile's contention, there was direct evidence of his impairment introduced at the adjudicatory delinquency hearing, and this evidence was sufficient to establish that his impairment rendered him incapable of caring for his brother. According to the testimony of Fitzpatrick and Reinold, the juvenile was under the influence of alcohol and marijuana. He had "[m]umbling, slurring speech," and his eyes were "red, glassy," "droopy," and bloodshot. Additionally, when the officers tried to speak with him, he was unable to look up at them from where he was seated on the couch. According to the officers, the juvenile was not capable of caring for another person in his then current state. Indeed, as suggested by the officers' testimony that they would not have left the juvenile alone in the apartment, the trial court could have found that he was not even in a position to care for himself. We therefore conclude, on the facts of this case, that the evidence of the juvenile's intoxication was sufficient to prove that he violated the duty of care owed to his brother.

4

The juvenile next argues that the evidence was "insufficient to prove that [he] knowingly placed [his brother] in danger." Specifically, he contends that the State failed to present evidence "that [his] conduct, or [his] resulting condition, exposed [his brother] to any harm." He asserts that RSA 639:3, I, requires that the child be placed in actual risk of danger, and that the risk of danger to his brother in the instant case was merely "speculative and hypothetical." He claims that "[i]t is not sufficient [for the State] to prove a possibility of danger if some hypothetical circumstance arose." In response, the State appears to contend that a child is "endanger[ed]" under RSA 639:3, I, whenever the child is subjected to potential harm, and that, here, the juvenile subjected his brother to potential harm when he rendered himself incapable of caring for the child.

The interpretation of a statute is a question of law, which we review de novo. Dichiara v. Sanborn Reg'l Sch. Dist., 165 N.H. 694, 696 (2013). "In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole." State v. Gilley, 168 N.H. 188, 189 (2015). "We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice." Id. "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Id. "Further, we interpret legislative intent from the statute as written and will not consider what the legislature might have said, or add language that it did not see fit to include." Id. at 189–90. "[W]e interpret a statute in the context of the overall statutory scheme and not in isolation." Id. at 190. "We will not interpret a statute to require an illogical result." State v. Yates, 152 N.H. 245, 255 (2005).

As noted above, to secure a conviction under RSA 639:3, I, the State must prove, among other things, that the offender "knowingly endanger[ed] the welfare of a child under 18 years of age." RSA 639:3, I. The statute does not define the term "endanger" and we have not previously interpreted the meaning of the term under the statute. However, the term "endanger" commonly means "to bring into danger or peril of probable harm or loss: imperil or threaten danger to." Webster's Third New International Dictionary 748 (unabridged ed. 2002); see Gilley, 168 N.H. at 190 (explaining that where a term is undefined by statute, "we look to its common usage, using the dictionary for guidance"). This definition suggests that a child is "endangered" under RSA 639:3, I, when the risk of injury to his or her welfare is actual and significant—as opposed to speculative or a mere possibility. See Webster's Third New International Dictionary, supra at 748; see also State v. Rodney Portigue, 125 N.H. 352, 359, 367 (1984) (evidence sufficient to support conviction under RSA 639:3, I, when testimony at trial established that defendant failed to promptly remove child from home and seek medical attention for child after child sustained significant injuries from repetitive physical abuse at hands of defendant's wife). We thus conclude that, under RSA 639:3, I, evidence is sufficient to prove

5

"endangerment" if it establishes that the offender engaged in behavior creating an actual and significant risk of injury to a child's welfare. Accordingly, the evidence presented at the adjudicatory delinquency hearing will have been sufficient if the juvenile's behavior in the instant case created an actual and significant risk of injury to his brother's welfare.

The delinquency petition alleged that the juvenile endangered his brother by "smok[ing] marijuana and consum[ing] alcohol." We have not previously considered whether caregiver intoxication or impairment creates an actual and significant risk of injury to a child's welfare. In assessing the nature and significance of the risk to a child in these and similar circumstances, courts in other jurisdictions have engaged in a fact-specific inquiry, considering the totality of the surrounding circumstances present in a given case. See, e.g., Barnes v. Com., 622 S.E.2d 278, 282 (Va. Ct. App. 2005) (noting that analysis of sufficiency of evidence supporting child endangerment conviction depends upon specific circumstances of the case); cf. State Dept. of Human Servs. v. D.T.C., 219 P.3d 610, 616 (Or. Ct. App. 2009) (considering totality of circumstances in assessing whether there was a reasonable likelihood of harm to the welfare of the children). We, accordingly, consider the totality of the circumstances in assessing whether the juvenile's behavior created an actual and significant risk of injury to his brother's welfare. Looking to Barnes for guidance, we conclude that, among the factors to be considered are: (1) the "gravity and character" of the risk; (2) the "degree of accessibility" of the offender; (3) the length of time that the child was exposed to the risk; (4) the child's "age and maturity"; and (5) the "protective measures" taken by the offender, if any. Barnes, 622 S.E.2d at 282.

Considering these factors together, and considering the evidence presented at the hearing in the light most favorable to the State, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the juvenile "endanger[ed]" his brother's welfare. RSA 639:3, I. Here, the child was only four years old, and the juvenile was effectively inaccessible. See Barnes, 622 S.E.2d at 282. As discussed above, a rational trier of fact could have found that the extent of the juvenile's impairment rendered him incapable of caring for his brother. By rendering himself incapable of providing care, the juvenile—then, the child's sole caregiver—effectively abandoned the child. Courts in other jurisdictions have found the abandonment of a child of this young age sufficient to support a conviction for child endangerment. See, e.g., Barnes, 622 S.E.2d at 280–81 (evidence sufficient to support conviction for child endangerment where defendant left two-year-old and four-year-old alone and asleep in apartment while she went to grocery store); People v. Reyes, No. 2008KN019196, 2008 WL 3010044, at *2–3 (N.Y. Crim. Ct. Aug. 6, 2008) (unpublished table decision) (finding endangering the welfare of a child complaint facially sufficient where it alleged that defendant left four-year-old child alone in an apartment for fifteen minutes). There is also no indication

6

that the juvenile took any "protective measures" in the instant case.  Barnes, 622 S.E.2d at 282.

Additionally, we disagree with the juvenile's contention that the risk of danger in the instant case was merely "speculative and hypothetical." Although the juvenile's brother generally slept through the night, there still existed a risk that he would awaken and move about the apartment.  Cf. id. at 281 (recognizing risk that two-year-old and four-year-old would awaken and exit unlocked door to apartment).  If the child had done so, he would have been subjected to the unsafe and unsanitary conditions in the apartment.  The apartment smelled of marijuana, the kitchen floor was sticky and wet with beer, and there were beer cans and ashes scattered throughout the kitchen and living room.  The juvenile's brother could easily have been harmed by either ingesting the alcohol readily within reach, or slipping on the floor slick with beer and littered with ashes and beer cans.  Cf. People v. Perez, No. 2008NY046914, 2009 WL 57599, at *4 (N.Y. Crim. Ct. Jan. 12, 2009) (unpublished table decision) ("In this case, the risk of an accident causing harm to the children was significant given the hazards present in the apartment: urine on the floor, bleach bottles in the tub, and cockroaches crawling on the children."); State v. Graham, 109 P.3d 285, 291 (N.M. 2005) (jury could reasonably conclude that three-year-old child and a one-year-old child were endangered where they had access to marijuana).  Although the record does not reflect the precise length of time that the child was exposed to this risk, we cannot conclude on the record before us that the length of the exposure was so minimal as to eliminate the risk.  Ultimately, we conclude that—on the facts present here, including the young age of the child and the extent of the juvenile's intoxication—a rational trier of fact could have found, beyond a reasonable doubt, that the juvenile's behavior created a risk to his brother's welfare that was both actual and significant.

Relying on our decision in Bortner, the juvenile also argues that "a violation of the duty of care only endangers the welfare of a child if and when it exposes the child to a risk of death or serious injury."  In Bortner, the defendant argued that the child endangerment statute was unconstitutionally vague because RSA 639:3, I, "incorporates the two irreconcilable mens rea of knowingly and purposely."  Bortner, 150 N.H. at 511.  We disagreed, concluding that "there are numerous ways in which a person can purposely fail to act without knowing it will endanger the welfare of a child."  Id.  To demonstrate that the two separate mens rea of knowingly and purposely were not necessarily incompatible, we provided the following example:

> [A] parent who fails to seek medical attention for a child who
> sprains a finger may have purposely violated a duty of care that
> the parent owes to the child.  But, since a sprained finger is
> unlikely to cause death or serious injury, it is possible that the
> parent did not knowingly endanger the welfare of the child.  On the

7

other hand, a parent who fails to promptly seek medical attention for a child who stops breathing may have purposely violated a duty of care. In addition, the parent may have knowingly endangered the welfare of the child due to the high risk of death or serious injury that is likely to result.

Id.

The juvenile interprets this language from Bortner as requiring the State to prove that the child was exposed to a risk of death or serious injury to satisfy the endangerment requirement of RSA 639:3, I. We disagree with this interpretation. We used this example in Bortner to demonstrate that knowingly and purposely were not necessarily incompatible—not to explain the severity of the danger required by the statute. Id. Our example related, not to the meaning of "endanger," but to the mens rea attached to the "endangers the welfare of a child" element of the statute. Here, the juvenile's argument relates to the meaning of "endanger"—not to the mens rea of knowingly. Thus, Bortner is inapposite.

In sum, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the State, we hold that the record contains sufficient evidence for a rational trier of fact to have concluded that the juvenile "knowingly endanger[ed] the welfare of a child under 18 years of age . . . by purposely violating a duty of care, protection or support he owe[d] to such child." RSA 639:3, I.

Affirmed.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.

8