Board of Tax and Land Appeals
No. 94-291

## APPEAL OF EMISSARIES OF DIVINE LIGHT

### (New Hampshire Board of Tax and Land Appeals)

December 27, 1995

*Law Offices of K.S. Williams-Hardy,* of Epping (*Kathryn Swain Williams* on the brief and orally), for the Emissaries of Divine Light.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Arthur G. Greene* and *Maria Holland Law* on the brief, and *Mr. Greene* orally), for the Town of Epping.

*H. Bernard Waugh, Jr.*, of Concord, by brief for the New Hampshire Municipal Association, as *amicus curiae*.

THAYER, J. The taxpayer, the Emissaries of Divine Light, appeals an order of the New Hampshire Board of Tax and Land Appeals (board) awarding it a partial exemption from property taxes for the 1990 and 1991 tax years. The taxpayer argues that it is entitled to full tax exemption and that apportionment is inappropriate in religious exemption cases. It also argues that the board violated its first amendment rights under the Federal Constitution. We affirm.

The taxpayer is a religious organization located in Epping. The taxpayer owns a number of parcels of real estate, referred to collectively as Green Pastures. The property contains a chapel, classrooms, administrative offices, a parsonage, multi-unit residential buildings, dormitories, a dining hall, agricultural buildings, and support buildings. The property also contains agricultural land, wooded lots, and vacant land.

The board found that the taxpayer's property was used by members who lived and worked on the property, by visitors and students whose use of the property related to the taxpayer's religious programs, by members and visitors whose use did not relate to the taxpayer's religious programs, and by members who lived on the property but worked outside the community and paid rent to the taxpayer. The board also found that some of the members worked on the taxpayer's agricultural land and used the food they produced.

Based on those findings, the board ruled that only certain portions of the taxpayer's property were exempt. It rejected the taxpayer's argument that its property was a tax-exempt "monastery" for purposes of RSA 72:23, III (1991) (amended 1994). The board ruled that the chapel, the dining hall (in 1990), the administrative building, the parsonage, a classroom building, and the land appurtenant to those buildings were used principally for religious purposes and therefore were exempt from taxation under RSA 72:23, III. In contrast, the board ruled that the remaining portions of the property—including the residences, agricultural land, support buildings, and vacant land—were not used principally for religious purposes and were therefore not tax-exempt.

The board denied the taxpayer's motion for rehearing, and the taxpayer appealed to this court. We will uphold the board's ruling unless the taxpayer proves that the board's decision was "clearly

unreasonable or unlawful." *Appeal of Kiwanis Club of Hudson*, 140 N.H. 92, 93, 663 A.2d 90, 91 (1995) (quotation omitted). "[A]ll findings of the [board] upon all questions of fact shall be deemed to be prima facie lawful and reasonable." *Id.* (quotations and ellipses omitted) (alteration in original); *see* RSA 541:13 (1974).

■ The taxpayer argues first that the board incorrectly held that it was not a "monastery" under RSA 72:23, III and therefore erred in denying it a full tax exemption. We disagree. Monasteries are exempt from taxation under the statute. *See* RSA 72:23, III. WEBSTER'S defines "monastery" as "a house of religious retirement or of seclusion from the world for persons under religious vows." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1457 (unabridged ed. 1961). Applying a similar definition, the board concluded that the taxpayer was not a monastery because its members are allowed to work outside the religious community and do not take vows.

We see nothing in the record to indicate that the board's conclusion is unreasonable. Emissaries members do not live in religious retirement or seclusion from the world. Instead, as the board correctly found, many members live on the taxpayer's property but work in surrounding communities and pay rent to the taxpayer. Moreover, members do not take vows; they merely enter into an "agreement" to be part of the Emissaries community. Those facts support the board's conclusion that the taxpayer was not a monastery.

The taxpayer argues next that the board erred by interpreting RSA 72:23, III too narrowly. According to the taxpayer, the board should have read RSA 72:23, III broadly to include all of the taxpayer's property because both the legislative history of the statute and our prior case law demand an expansive reading. We disagree.

■ RSA 72:23, III provides that the following are exempt from taxation:

> [h]ouses of public worship, parish houses, church parsonages occupied by their pastors, convents, monasteries, buildings used principally for religious training or for other religious purposes, and the lands thereto appertaining owned and occupied by any regularly recognized and constituted denomination, creed or sect, organized or incorporated in this state and the personal property used by them for the purposes for which they are established.

RSA 72:23, III. "In construing [a religious exemption statute] we do not adopt a liberal attitude because it is charity nor a hostile attitude because it seeks exemption from taxation. The legislative intention is sought without regard to rules requiring strict or liberal construction for certain classes of legislation." *Franciscan Fathers v. Pittsfield*, 97 N.H. 396, 400, 89 A.2d 752, 755 (1952) (citation omitted); *cf. Wolfeboro Camp School v. Town of Wolfeboro*, 138 N.H. 496, 499, 642 A.2d 928, 930 (1994) (tax exemption statute construed to give full effect to the legislative intent of the statute). We have previously held that the legislature, in drafting RSA 72:23, III, intended to exempt land "owned and occupied" by a religious association that is "a part of, or used directly in conjunction with, buildings used principally for religious purposes." *Alton Bay Camp Meeting Asso. v. Alton*, 109 N.H. 44, 48, 242 A.2d 80, 84 (1968) (quotations and ellipses omitted). In light of the legislature's intent, we cannot conclude that the board's interpretation of RSA 72:23, III, which focused on the principal use of the taxpayer's property, was unreasonably narrow.

██ The taxpayer next argues that the statute does not allow apportionment between exempt and non-exempt uses in religious exemption cases. This assertion is unsupported by our case law. In *Franciscan Fathers*, we recognized that certain property may be exempt, while other property, not used for religious activity, would not be exempt from taxation. *Franciscan Fathers*, 97 N.H. at 401, 89 A.2d at 756. Additionally, in considering other statutory exemptions, we have consistently utilized apportionment when appropriate. *See, e.g., St. Paul's School v. City of Concord*, 117 N.H. 243, 251-59, 372 A.2d 269, 274-79 (1977); *Alton Bay Camp Meeting Asso.*, 109 N.H. at 49-52, 242 A.2d at 85-87. We find nothing in the language of the religious exemption statute to suggest that the legislature intended to treat religious exemptions differently than other tax exemption statutes.

██ According to the taxpayer, apportionment is not appropriate in religious exemption cases because it requires an impermissible inquiry into the validity of their religion. We disagree. The board never questioned the validity of the taxpayer's religion. It simply attempted to determine whether the "land [was] occupied and used principally by the [church members] for their own private and secular purposes and not for the statutory exempted religious purposes of the association." *Alton Bay Camp Meeting Asso.*, 109 N.H. at 49, 242 A.2d at 84-85. Such inquiry is appropriate to determine an organization's eligibility for tax exemption. *Id.; see also Franciscan Fathers*, 97 N.H. at 401, 89 A.2d at 756.

■ The taxpayer next argues that the board erred in granting it only a partial exemption because the record supports a finding that the taxpayer used all of its buildings and land principally for its religious purposes. The taxpayer bears the burden of proving its entitlement to a tax exemption. *New Canaan Academy v. Town of Canaan*, 122 N.H. 134, 138, 441 A.2d 1174, 1176 (1982). The board found that the taxpayer failed to meet its burden with respect to its agricultural land, residential buildings, vacant lots, and support buildings. In reaching that conclusion, the board acknowledged that both the residential and support buildings were occupied by the taxpayer's members, but held that the taxpayer failed to prove their residency was essential to the taxpayer's religious goals.

In addition, two members of the board acknowledged that some of the taxpayer's agricultural property might qualify for tax exempt status because members used it mainly to fulfill the taxpayer's religious purposes. The board concluded, however, that the taxpayer failed to introduce sufficient evidence on that point. *See Franciscan Fathers*, 97 N.H. at 401, 89 A.2d 756. It explained: "[C]ertainly [all] 160 acres [of the Taxpayer's land] was not integral to the Taxpayer's . . . religious purposes." Without more evidence concerning the amount of agricultural land actually used for religious purposes, the board concluded that it could not grant the taxpayer an exemption.

The record supports the board's holding. The taxpayer's witnesses testified that residential living and agricultural work were important elements of their religion, but they did not demonstrate that either activity was undertaken for the principal benefit of the taxpayer and its religious functions. The record reveals that residential living and agricultural involvement were only required for certain short-term courses given by the taxpayer. In fact, approximately sixty-eight percent of the New England members did not live on the taxpayer's property in 1990. Even some of those who lived on the property worked mainly outside the taxpayer's community, not on the taxpayer's land. Taken together, these facts undermine the taxpayer's claim that the residential living and agricultural work on the taxpayer's land were essential to its religious purpose.

Moreover, the taxpayer failed to demonstrate what portion of visitors to the property were present for religious training. More than half of the taxpayer's beds were available to visitors in 1990. Yet without evidence indicating that the beds were used by visitors staying at the taxpayer's property for religious reasons, we cannot overturn the board's finding that the residential buildings were not principally used to support its religious goals. In short, viewing the

record as a whole, we cannot say that the board's decision was clearly unreasonable. *Appeal of Kiwanis Club of Hudson*, 140 N.H. at 93, 663 A.2d at 91.

■ Although some members may have engaged in communal living and tilling of the soil to practice their religious beliefs, doing so did not necessarily confer tax exempt status on the taxpayer's residential and agricultural property. Those activities were not required of members to qualify for good standing in the community and therefore amounted to members' own religious worship. Their use of the property for private religious worship does not entitle the religious association or entity to an exemption. *Cf. St. Paul's School*, 117 N.H. at 252, 372 A.2d at 275 (benefit of faculty housing must be to entity, not individual faculty members).

Finally, the taxpayer argues that the exemption statute, as applied by the board, violates the establishment and free exercise clauses of the first amendment to the United States Constitution. More specifically, the taxpayer contends that the board's application of RSA 72:23, III was biased against the taxpayer and was therefore tantamount to an establishment of other religions which the board viewed more favorably. In addition, the taxpayer argues that the board engaged in an evaluation of the taxpayer's religious beliefs which burdened the right of Emissaries members to exercise their religion freely.

The first amendment provides that government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The United States Supreme Court has interpreted the first part of the amendment, the establishment clause, in several cases similar to this one. It has recognized that States may grant tax exemptions to religious organizations without offending the establishment clause, provided that the purpose of the exemption "is not aimed at establishing, sponsoring, or supporting religion," *Waltz v. Tax Commission*, 397 U.S. 664, 674 (1970), and that the exemption does not create an "excessive government entanglement with religion." *Id.; cf. Opinion of the Justices*, 113 N.H. 297, 300, 307 A.2d 558, 559 (1973).

■ On its face, RSA 72:23, III satisfies the test developed by the Supreme Court. The statute grants exemptions to all religious organizations and to charitable and educational organizations as well. As a result, we believe that the statute was not designed to—and does not in fact—establish or advance religion, but rather fosters "beneficial and stabilizing influences in community life." *Waltz*, 397 U.S. at 673; *cf. Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 11-12 (1989). Similarly, the statute requires "only a minimal and

remote involvement between church and state," *Waltz*, 392 U.S. at 676, and therefore does not create the excessive entanglement that the Constitution prohibits. *See id.* ("[s]eparation in this context cannot mean absence of all contact"). Consequently, we hold that the statute does not offend the establishment clause of the United States Constitution.

■ The taxpayer argues that the board did not apply the exemption statute in a neutral manner because it unfairly compared it to mainstream religions, thereby helping to "establish" the religions that the board viewed more favorably. The references in the board's decision to other religions, however, were used only to aid the board's analysis. Such comparisons have been recognized and utilized by the Supreme Court. *See, e.g., United States v. Seeger*, 380 U.S. 163, 166 (1965) (test for conscientious objector is whether individual's belief occupies a parallel place to that filled by the "orthodox belief in God of one who clearly qualifies for the exemption"). Therefore, we cannot conclude, based on the evidence, that the board applied the exemption statute in a biased manner or "established" any other religion.

■ The taxpayer also argues that the board engaged in an impermissible evaluation of the taxpayer's religious beliefs and in doing so violated the free exercise clause of the first amendment. According to the taxpayer, the board's inquiry into the validity of the taxpayer's beliefs discouraged Emissaries members from practicing their religion and thereby burdened their right of free exercise. *See Swaggart Ministries v. Cal. Bd. of Equalization*, 493 U.S. 378, 384-85 (1990) (free exercise inquiry asks whether government has placed substantial burden on observation of a central religious belief or practice and, if so, whether compelling governmental interest justifies burden). The taxpayer's characterization of the board's inquiry, however, is unsupported by the record. The board did not attempt to determine whether the taxpayer's beliefs were valid. It simply determined whether the land was "used principally for . . . religious purposes." RSA 72:23, III. As such, the board's inquiry imposed no restrictions on the taxpayer's religious practices or beliefs, nor did it constitute a prior restraint on those beliefs. *See Swaggart Ministries*, 493 U.S. at 389.

*Affirmed.*

BRODERICK, J., did not sit; the others concurred.