Board of Tax and Land Appeals
No. 2006-631

## APPEAL OF CITY OF NASHUA
### (New Hampshire Board of Tax and Land Appeals)

Argued: March 22, 2007
Opinion Issued: May 11, 2007

*Office of Corporation Counsel*, of Nashua (*David R. Connell* on the brief and orally), for the petitioner.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*William J. Donovan* on the brief and orally), for the respondent.

DUGGAN, J. The petitioner, City of Nashua (City), appeals a decision of the board of tax and land appeals (BTLA) granting a religious tax exemption for property owned by the respondent, the Roman Catholic Bishop of Manchester. *See* RSA 72:23, III (2003). We reverse.

The following appears in the record. Beginning in about 2001, the respondent began a process of reorganizing churches in the City due to budgetary and staffing concerns. In connection with the reorganization process, the respondent decided to "suppress" St. Francis and St. Casimir parishes in 2003.

When St. Francis was suppressed, the church buildings were deconsecrated and the parishioners became members of another parish.

The respondent, however, continued to maintain the buildings and to use them to house items of religious significance such as marble altars, marble pulpits, a cross, stained glass windows, organs, stations of the cross, statues, and pews, among others. In March 2003, St. Francis was closed and placed for sale. Litigation then ensued over whether the respondent had the authority to sell the property. *See Berthiaume v. McCormack*, 153 N.H. 239 (2006). Despite being located upon property that had been put up for sale, the rectory at St. Francis remained open until the late summer of 2003, and continued thereafter to be used for storage and by a local "Neighborhood Watch" group.

Likewise, when St. Casimir was suppressed, it was deconsecrated and its parishioners became members of another parish. Both the church and its rectory were used for storage before being sold on September 22, 2004.

Meanwhile, the respondent sought a tax exemption on the properties containing both churches for the 2004 tax year. The City denied the exemption applications, and the respondent appealed to the BTLA. In a two-to-one decision, the BTLA ruled that the respondent was entitled to a tax exemption. This appeal followed.

Appeals from BTLA decisions are governed by RSA chapter 541. *Appeal of Town of Wolfeboro*, 152 N.H. 455, 458 (2005). Findings of fact made by the BTLA are deemed *prima facie* lawful and reasonable. *Id.* The BTLA's decision will not be set aside or vacated except for errors of law, unless the City establishes, by a clear preponderance of the evidence before it, that such order was unjust or unreasonable. *Id.* "The burden of demonstrating the applicability of any exemption [is] . . . upon the claimant." RSA 72:23-m (2003).

Resolution of this appeal requires us to construe RSA 72:23, III. The interpretation and application of statutes present questions of law, which we review *de novo*. *Town of Hinsdale v. Town of Chesterfield*, 153 N.H. 70, 72 (2005).

RSA 72:23 provides, in pertinent part:

> The following real estate and personal property shall, unless otherwise provided by statute, be exempt from taxation:
>
> . . . .
>
> III. Houses of public worship, parish houses, church parsonages occupied by their pastors, convents, monasteries, buildings and the lands appertaining to them owned, used and occupied directly for religious training or for other religious purposes by any regularly recognized and constituted denomination, creed or sect, organized, incorporated or legally doing business in this state and

the personal property used by them for the purposes for which they are established.

■ In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Town of Hinsdale*, 153 N.H. at 72. When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Appeal of Town of Bethlehem*, 154 N.H. 314, 319 (2006). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* In construing a religious exemption statute, we adopt neither a liberal attitude because it is charity, nor a hostile attitude because it seeks exemption from taxation. *Appeal of Emissaries of Divine Light*, 140 N.H. 552, 556 (1995).

According to the plain language of the statute, the land upon which the exemption is sought must be "owned, used and occupied directly for religious training or for other religious purposes by any regularly recognized and constituted denomination . . . ." RSA 72:23, III; *see also Alton Bay Camp Meeting Asso. v. Alton*, 109 N.H. 44, 48-49 (1968); *E. Coast Conf. of the Evangelical Covenant Church of America v. Town of Swanzey*, 146 N.H. 658, 663 (2001). There is no dispute that both premises were owned by the respondent. Nor is there any dispute that the respondent is a regularly recognized and constituted denomination. However, ownership is only one part of the tax exemption inquiry. We must also determine whether the premises were being used and occupied directly for religious purposes. We conclude that they were not.

■ With respect to the fact that the churches contained items "not in active use," the respondent contends that many organizations, such as hospitals, have items that are not in constant use, and that the temporary disuse of certain items at a given property should not result in the denial of a tax exemption application. However, this is not a case in which a building contains a few items that are not, at one time or another, in use. Rather, here, each church was functioning as storage space for items, none of which was in use. The respondent also contends that the churches were being used for a religious purpose insofar as they were "preserv[ing] and protect[ing] the religious objects of the church." However, the mere storage of religious objects in a deconsecrated church, on a temporary basis, does not rise to the level of using or occupying the space for "religious purposes." Instead, it amounts to using the space for convenient interim storage during the pendency of an anticipated sale, a use that is not altered by the fact that the items being stored happen to have religious significance. *Cf. Alton Bay*, 109 N.H. at 50 (the fact that religiously-

affiliated persons were staying in the rooming building at issue did not entitle camp to religious tax exemption). As the dissenting opinion from the BTLA observed, "A locked facility used simply to store articles, some of which may have religious significance, until such time as a future use can be determined does not satisfy the requirements of the exemption statute."

Furthermore, although the respondent was in the process of reorganizing and restructuring its parishes, both churches had been suppressed or deconsecrated and the parishioners already were conducting their worship and church-related activities elsewhere. Thus, no one was occupying either premises for religious purposes. *Cf. Trustees of N.H. Conference v. Sandown*, 87 N.H. 47, 48 (1934) (religious home considered "occupied" for *charitable* purposes where retired Methodist clergyman lived on the property); *Franciscan Fathers v. Pittsfield*, 97 N.H. 396, 400-01 (1952) (Catholic clergy occupied premises at issue); *Society of Cincinnati v. Exeter*, 92 N.H. 348, 351 (1943) (holding, under earlier version of charitable tax exemption statute, that it contemplates occupancy as more than bare possession; if the building were rented, it would be taxable, and it is no less so while it remains indefinitely idle).

Although the BTLA majority opinion cited the use of the rectory at St. Francis for a "Neighborhood Watch" program, this fact cannot, on this record, satisfy the requirement that the property be used or occupied for religious purposes. Nothing in the record links the Neighborhood Watch to any religious activity of the Catholic Church. Nor, in our view, can the provision of maintenance and security services be considered a use or occupation of the premises for "religious purposes" within the meaning of the statute. *See The Dominican Nuns v. City of LaCrosse*, 419 N.W.2d 270, 271-72 (Wis. Ct. App. 1987).

Our holding today is consistent with how we have interpreted the legislative intent of the religious tax exemption statute in previous cases. "We have previously held that the legislature, in drafting RSA 72:23, III, intended to exempt land owned and occupied by a religious association that is a part of, or used directly in conjunction with, buildings used principally for religious purposes." *Emissaries*, 140 N.H. at 556 (quotation omitted).

Our holding today is also consistent with case law from other jurisdictions. For example, in *Roman Catholic Archdiocese of Newark v. City of East Orange*, 18 N.J. Tax 649, 651 (N.J. Super. Ct. App. Div. 2000), the court upheld a tax exemption granted to two parish churches that had been closed and suppressed by the Archdiocese due to "changing demographics." However, the facts of *East Orange* were more compelling than those in the instant case. In *East Orange*, the two suppressed churches were, in addition to being used for storage of church records and

artifacts, also used for deanery meetings and a youth basketball program. *Id.* Moreover, "a priest conduct[ed] a weekly mass in the churches of each closed parish." *Id.* Here, by contrast, the only activity found to have occurred on the premises, aside from maintenance, was storage. *See also Our Savior Lutheran Church v. Dep't of Revenue*, 562 N.E.2d 1198, 1199 (Ill. App. Ct. 1990) (church entitled to tax exemption where it was used not only for storage of religious artifacts, but also for bake sales, flea markets, choir practice and as a site for accumulating clothing and other materials before they were shipped to missionary sites). Thus, we conclude no exemption is contemplated for "vacant land and buildings in the process of disposal." *The Dominican Nuns*, 419 N.W.2d at 272.

*Reversed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.