Board of Tax and Land Appeals
No. 2011-368

## APPEAL OF LIBERTY ASSEMBLY OF GOD
### (New Hampshire Board of Tax and Land Appeals)

Argued: February 9, 2012
Opinion Issued: May 22, 2012

624

*Lisa A. Biron*, of Manchester, by brief and orally, and Alliance Defense Fund, of Leawood, Kansas (*Joel Oster* on the brief), for the petitioner.

*City Solicitor's Office*, of Concord (*James Kennedy* and *Danielle L. Pacik* on the brief, and *Ms. Pacik* orally), for the respondent.

CONBOY, J. The petitioner, Liberty Assembly of God (Assembly), appeals the decision of the New Hampshire Board of Tax and Land Appeals (BTLA) upholding a 2008 decision of the respondent, City of Concord (City), denying Assembly's request for a religious use tax exemption. We affirm.

The following facts are drawn from the record. Assembly is a "regularly recognized and constituted" religious denomination, incorporated in the State of New Hampshire. RSA 72:23, III (2003). Assembly owns 26.13 acres of land in Concord; approximately twenty acres are in "current use." *See* RSA ch. 79-A (2003 & Supp. 2011). The undeveloped land is used primarily for agricultural or forestry purposes, although there is a "prayer trail" around its perimeter. The developed portion of Assembly's property includes a main building, a freestanding barn now used for storage, and the parsonage and associated garage.

From 1994, when Assembly acquired its property, until 2008, the City granted Assembly a religious use tax exemption on all of its property. However, in 2008, the City granted Assembly an exemption on only forty percent of its property, concluding that sixty percent of the property was not used and occupied for religious training or other religious purposes, and was therefore taxable. The City subsequently revised its determination and exempted sixty percent of the property.

The City exempted from taxation the storage barn, parsonage and garage, and one of the six acres of land not in current use "appertaining to them." RSA 72:23, III. The remaining five acres not in current use were allocated as taxable or exempt at the same proportion as the taxable and exempt square footage of the main building; 2.2 acres were assessed as a

primary commercial site supporting the main building and 2.8 acres were assessed as supplemental commercial land. The City arrived at the sixty percent exempt/forty percent taxable ratio based upon the use of various areas of the combined square footage of both floors of the main building.

The City concluded that of the 13,988 square feet of the first floor, 12,516 square feet were exempt as they were used directly for religious purposes; this included the sanctuary, church offices, child care space, prayer room, recreation room, kitchen and fellowship hall, library and record room, classrooms and computer lab, food pantry, storage rooms, and restrooms. The remaining 1,472 square feet on the first floor, consisting of an apartment and an additional room available for missionaries on furlough, were considered taxable under the City's assessment. These rooms were not used by furloughed missionaries at any time during 2008, and only three or four times during the preceding four-year period.

The City considered the entire second floor of the main building (6,916 square feet) taxable as not being used for religious purposes. This space consisted of five general areas: (1) an apartment and two storage rooms occupied or utilized by a part-time caretaker and his family; (2) a room occupied by the grandson of Assembly's then-secretary/treasurer; (3) vacant apartments; (4) "dorm" rooms minimally used for storage; and (5) a men's restroom, auxiliary to the restrooms on the first floor. Following appeal, the BTLA upheld the City's apportionment for tax year 2008.

Our review of BTLA decisions is well established:

> The burden of proof shall be upon the party seeking to set aside any order or decision of the BTLA to show that the same is clearly unreasonable or unlawful, and all findings of the BTLA upon all questions of fact properly before it shall be deemed to be *prima facie* lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable.

*Appeal of City of Concord*, 161 N.H. 169, 171 (2010) (quotation and brackets omitted); *see* RSA 541:13 (2007). "Although we review the [BTLA's] findings of fact pursuant to this deferential standard, we review its statutory interpretation *de novo*." *Appeal of Gamas*, 158 N.H. 646, 648 (2009).

Assembly asserts that the BTLA's ruling was erroneous on three interrelated grounds: (1) the City and the BTLA misinterpreted RSA 72:23, III because it should be read as fully exempting houses of worship from taxation; (2) the City's inquiries into the religious uses and purposes of each room within the church building unconstitutionally "entangled" the

government with religion; and (3) even if the statute and constitution permit parsing taxable from exempt space within a house of worship, all of Assembly's space should be exempt as serving a religious purpose. We address each argument in turn.

*I. Whether RSA 72:23, III Fully Exempts Houses of Worship from Taxation*

The statutory provision setting forth the tax exemption at issue states in pertinent part:

> The following real estate and personal property shall, unless otherwise provided by statute, be exempt from taxation: . . .
>
> . . .
>
> Houses of public worship, parish houses, church parsonages occupied by their pastors, convents, monasteries, buildings and the lands appertaining to them owned, used and occupied directly for religious training or for other religious purposes by any regularly recognized and constituted denomination, creed or sect, organized, incorporated or legally doing business in this state and the personal property used by them for the purposes for which they are established.

RSA 72:23, III.

Assembly argues that, pursuant to the "last antecedent rule" of statutory construction, *see Gen. Insulation Co. v. Eckman Constr.*, 159 N.H. 601, 610 (2010), courts should construe statutes so that "a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation." *Mt. Valley Mall Assocs. v. Municipality of Conway*, 144 N.H. 642, 652 (2000) (quotation omitted). Thus, it urges us to read RSA 72:23, III as creating five religious use exemptions that are not modified by the clause "owned, used and occupied directly for religious training or for other religious purposes" — that is, "[h]ouses of public worship," "parish houses," "church parsonages occupied by their pastors," "convents," and "monasteries." It argues that the clause modifies only the last category of property — that is, "buildings and the lands appertaining to them." Thus, once a structure is determined to be among the first five enumerated categories, it is automatically exempt from taxation, and any analysis of the extent to which it is "owned, used and occupied" for religious purposes is improper. Moreover, Assembly maintains that qualification as one of these first five enumerated structures is essentially definitional: "[I]f the building, owned

by the church, is its 'house of public worship[,]' it *is* used and occupied for a religious purpose, and room-by-room scrutiny is inappropriate, unworkable, and unconstitutional." The City counters that, reading the statute as a whole, the qualifying phrase "owned, used and occupied directly for religious training or other religious purposes" is intended to modify all of the enumerated properties set forth in RSA 72:23, III, including "houses of public worship."

■ "In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole." *Appeal of City of Nashua*, 155 N.H. 443, 445 (2007). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* In construing a religious exemption statute, we adopt neither a liberal attitude because it is a charity, nor a hostile attitude because it seeks exemption from taxation. *Id.* "We review legislative history to aid our analysis when the statutory language is ambiguous or subject to more than one reasonable interpretation." *First Berkshire Bus. Trust v. Comm'r, N.H. Dep't of Revenue Admin.*, 161 N.H. 176, 180 (2010).

Both the City's and Assembly's constructions of RSA 72:23, III are reasonable. Accordingly, the language of RSA 72:23, III is ambiguous. *See id.*

■ We implicitly construed a prior version of the statute as urged by the City. In *Alton Bay Camp Meeting Association v. Town of Alton*, 109 N.H. 44 (1968), the version of RSA 72:23, III then in effect exempted from taxation "houses of public worship, parish houses, church parsonages occupied by their pastors, convents, monasteries, buildings used principally for religious training or for other religious purposes, and *the lands thereto appertaining* owned and occupied by any regularly recognized and constituted denomination." (Quotation omitted; emphasis added.) We held that the statute required the applicant to establish that the purportedly exempt land "be 'appertaining' to *one or more of the types of buildings specified as exempt* in RSA 72:23[,] III." *Alton Bay*, 109 N.H. at 49 (emphasis added). By considering the modifying clause, "lands thereto appertaining" to govern exemptions for land appertaining to "one or more" of the enumerated "types of buildings specified as exempt in RSA 72:23," *id.*, we implicitly interpreted RSA 72:23, III as setting forth a list of properties all of which are subject to a subsequent modifying clause.

We now explicitly adopt the statutory construction we impliedly adopted in *Alton Bay*. We recognize that the statute has been amended since our

holding in *Alton Bay*, and we consider those amendments in our analysis of legislative intent. As we have previously noted:

> Examining the legislative history of the statute, we discover there have been no significant changes in its wording since our ruling in *Alton Bay*. In 1994, RSA 72:23, III was amended from exempting "buildings used *principally* for religious training or for other religious purposes, and the lands thereto appertaining owned and occupied by [a religious organization]" to exempting "buildings and the lands appertaining to them owned, used and occupied *directly* for religious training or for other religious purposes." This language merely clarifies that land owned by religious organizations must be "used and occupied directly" for religious purposes. *Accord* N.H.H.R. JOUR. 579-80 (1994).

*E. Coast Conf. of the Evangelical Covenant Church of America v. Town of Swanzey*, 146 N.H. 658, 663 (2001) (quotations omitted; emphasis added).

■ Assembly points to our holding in *St. Paul's Church v. Concord*, 75 N.H. 420 (1910), to support its argument that a "house of public worship" is, by definition, exempt from taxation in its entirety. When we issued our opinion in *St. Paul's Church*, the religious exemption statute provided: "Real estate . . . is liable to be taxed, except houses of public worship." *St. Paul's Church*, 75 N.H. at 421 (quotation omitted). In analyzing the legislative intent underlying that version of the statute, however, we held:

> If the house serves all the religious purposes for which it was designed and is not appropriated to other uses in the sense of a substantial exclusion of the religious use *from any part of it*, no reason is apparent why it does not promote all the uses which the legislature had in mind when it was exempted as a house of public worship. In this view, it is exclusively used as such a house. So long as the church organization occupies it for such public services of a religious character as it deems useful and desirable and as the building is adapted to subserve, *to the exclusion of all secular uses*, it is used exclusively as a house of public worship.

*Id.* at 425 (emphases added). Thus, even in that case, before intervening amendments, we recognized that applying the statutory tax exemption required analyzing the religious and secular uses of various portions of a building purported to be a "house of public worship."

Nor are we persuaded by Assembly's analysis of the legislative history of the current statute. Assembly contends that the 1994 statutory amendments "were not intended to change the application of the exemption to

'houses of public worship' or any of the other specifically listed properties," and that, therefore, the legislative history supports its contention that a house of public worship is entitled to a blanket exemption from taxation.

The legislature enacted amendments in 1994, "relative to the tax exempt status of certain properties," N.H.H.R. JOUR. 579 (1994), which "increased restrictions on the granting of property tax exemptions on property owned by churches." *Id.* at 580. As the report from the House Municipal and County Government Committee explained:

> While this bill touches a lot of nerves, testimony confirmed the base argument: exemption laws, as they now exist, leave a great deal of uncertainty for those who have to enforce them. The bill, as amended, intends to remove those uncertainties without removing the traditional exemptions for which there is broad public support. Its effect will be to close loopholes and protect against abuse.

*Id.* at 579. The amendments included adding the following provision: "The exemptions afforded by RSA 72:23 . . . shall be construed to confer exemption only upon property which meets requirements of the statute under which exemption is claimed. The burden of demonstrating the applicability of any exemption shall be upon the claimant." *Id.* at 580.

Other amendments also undermine Assembly's argument that a tax assessing body should simply accept a religious entity's assertion that a particular building represents a "house of public worship" and is, thus, exempt. Before the 1994 amendments, the statute required religious entities to submit a list of properties for which a tax exemption was claimed. However, pursuant to the amendments, "City assessors . . . and other officials having power to act under the provisions of this chapter to grant or deny tax exemptions to religious . . . organizations shall have the authority to request" materials concerning the organization seeking exemption, as well as the nature of the property for which the exemption is claimed, "and such other information as shall be reasonably required to make determinations of exemption of property under" RSA chapter 72. RSA 72:23-c, II (2003). The amendments also provide that an organization's failure to provide such information within thirty days of a reasonable written request shall result in a denial of exemption. *Id.*

■ The legislative scheme therefore does not support Assembly's argument that a church's assertion that a building constitutes a "house of public worship" is sufficient to place it beyond investigation. The statute provides that the City must determine whether a building owned by a religious entity is entitled to exemption because it is "used and occupied"

directly for a religious purpose — an interpretation that our precedent, including *St. Paul's Church* and *Alton Bay*, supports. Accordingly, in light of the evidence that the legislative intent of the statute is to render all of the buildings specified in RSA 72:23, III subject to the modifier "owned, used and occupied directly for religious . . . purposes," the last antecedent rule does not require a contrary interpretation. *See DeVere v. Attorney General*, 146 N.H. 762, 768 (2001) (declining to apply the last antecedent rule where such an interpretation would be counter to legislative intent, as apparent from the statutory scheme).

Having determined that the legislative intent supports the BTLA's interpretation of the statute, we turn to the question of apportionment. We have previously directly addressed this question. In this case, as in *Appeal of Emissaries of Divine Light*, "[t]he taxpayer . . . argues that the statute does not allow apportionment between exempt and non-exempt uses in religious exemption cases." *Appeal of Emissaries of Divine Light*, 140 N.H. at 556. As we explained in *Emissaries of Divine Light*, this assertion is unsupported by our case law. *Id.* We have previously "recognized that certain property may be exempt, while other property, not used for religious activity, would not be exempt from taxation." *Id.* "Additionally, in considering other statutory exemptions, we have consistently utilized apportionment when appropriate. We find nothing in the language of the religious exemption statute to suggest that the legislature intended to treat religious exemptions differently than other tax exemption statutes." *Id.* (citations omitted).

■ Assembly seeks to distinguish *Emissaries of Divine Light* on the ground that the structures in that case were not among those enumerated in RSA 72:23, III. This argument is foreclosed by our holding today that the legislature did not intend that a "house of public worship" be evaluated differently from any other church-owned property; to be entitled to exemption any church-owned property must be "owned, used and occupied directly for religious . . . purposes."

■ The apportionment of exempt and non-exempt uses within a single building is also supported by our precedent. In *Trustees Exeter Academy v. Exeter*, we noted that a building partly used for exempt purposes and partly for taxable purposes "clearly may receive a proportional division of value according to the parts assigned to the different uses." *Trustees Exeter Academy v. Exeter*, 90 N.H. 472, 503 (1940); *see also Appeal of City of Concord*, 161 N.H. 344, 353-54 (2011). We agree with the BTLA, however, that an apportionment inquiry "must not be taken to an absurd extreme so that every square foot of a building is rigidly scrutinized. Rather, . . . judgment is the touchstone."

*II. Whether Apportioning Between Taxable and Tax-Exempt Space is Unconstitutional*

Assembly argues that examining the religious uses and purposes of each room inside of the main building "unconstitutionally entangle[s] the government with religion," and violates the Establishment Clause of the First Amendment to the Federal Constitution, as well as the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution. Because Assembly raises no claim under the State Constitution, we confine our analysis to its federal constitutional claims. *See State v. White*, 155 N.H. 119, 125 (2007).

We note that many of Assembly's arguments duplicate those we found unavailing in *Emissaries of Divine Light*, 140 N.H. at 554. Assembly first contends that "the City and BTLA rejected the Church's stated religious purpose based on the review of the Church's various rooms and uses, looking for whether such uses were *religious enough*. This analysis is flawed as it is essentially a test of whether the Church is 'sufficiently religious.' "

However, the record reflects that the City and the BTLA accepted the authenticity of Assembly's religion. We, accordingly, read Assembly's argument to oppose the City's review of the religious or secular use of portions of the main building. In *Emissaries of Divine Light*, as in this case, the taxpayer argued that apportionment was improper in religious exemption cases because it requires an impermissible inquiry into the validity of the taxpayer's religion. *Emissaries of Divine Light*, 140 N.H. at 556. We rejected that assertion in *Emissaries of Divine Light* because the BTLA "never questioned the validity of the taxpayer's religion," but, instead, "simply attempted to determine whether the land was occupied and used principally by church members for their own private and secular purposes and not for the statutory exempted religious purposes of the [taxpayer]." *Id.* (quotation and brackets omitted).

██ ██ We, likewise, reject Assembly's assertion in this case. As in *Emissaries of Divine Light*, the BTLA never questioned the validity of Assembly's religion. As the BTLA explained when evaluating whether Assembly's vacant rooms were used or occupied directly for a religious purpose:

> To be clear, the [BTLA] is neither, on one hand, questioning [Assembly's] stated assertion that providing [housing for the needy] is one of its biblical mandates nor, on the other, ruling that such use would necessarily qualify as a religious use; rather, we simply find neither by public knowledge nor in practice is there evidence the Property is used to any significant degree to house

the needy. In determining whether the statutory requirements for receiving an exemption have been met, "we look to both its charter or organizational statements *and its actions taken pursuant to those statements.*"

(Emphasis added; quotation omitted.) Thus, as in *Emissaries of Divine Light,* the BTLA merely examined whether Assembly "owned, used and occupied directly" its property "for religious training or for other religious purposes," as required by statute. RSA 72:23, III.

■ As for Assembly's argument, first advanced in its reply brief, that it has been "singled out" among other denominations for application of the statute, our consideration is brief. The record does not support this argument. Here, Assembly questions why the City did not examine and tax the "bathrooms and unused or messy rooms" of other religious denominations, without advancing any evidence to suggest that the City has not, in fact, examined or taxed other similarly situated churches. Nor has Assembly submitted evidence tending to show that the BTLA's inspection and partial denial of exemptions was improperly motivated on the basis of religion. In the absence of such evidence, we decline to further consider Assembly's selective prosecution argument. *See Branch Ministries v. Rossotti,* 211 F.3d 137, 144 (D.C. Cir. 2000).

■ We also reject Assembly's argument that its stated religious beliefs are sufficient to satisfy the requirement that its property be directly used for a religious purpose. We rejected a similar argument in *Emissaries of Divine Light,* 140 N.H. at 556, explaining that a taxpayer's religious beliefs are inadequate to determine whether land is being used for a religious purpose. Because our own case law on this subject is dispositive, we need not consider the out-of-state authorities upon which Assembly relies.

Without developed argument, Assembly states, "The Constitutional problems with the City's methods are apparent." To the extent that Assembly reiterates the constitutional arguments it lodged against the BTLA, we reject them for the reasons stated above. Assembly proposes an alternative methodology: "[T]he . . . analysis should be two-fold: (1) does the church espouse a religious purpose for [the property's] use and (2) is that assertion bona fide?" Having decided that the City's methodology was not flawed, we need not address Assembly's proposed methodology.

*III. Whether Assembly's Premises Were Exempt Because They Were Used for Religious Purposes*

Alternatively, Assembly argues that, even if the statute and Federal Constitution permit apportionment within a house of public worship, *all* of the uses to which Assembly put the property in 2008 were religious uses and, thus, tax-exempt.

Assembly first argues that the space occupied by the grandson was used for religious purposes because this space, although temporarily occupied by the grandson, was "made available for missionaries and the homeless/ needy." Assembly describes the space occupied by the grandson in 2008 as a first-floor missionary apartment and a dorm-style room on the second floor.

The BTLA found that the apartment on the first floor was taxable because, in fact, it was not used by furloughed missionaries at any time in 2008. The BTLA also observed that in the four-year period that the caretaker resided on the second floor of the main building, he could recall missionaries using the apartment on the first floor "only three or four times." The BTLA decided that this use was "slight and insignificant," and, therefore, "[did] not qualify the [first floor missionary apartment] [as] being used for religious purposes." The BTLA also ruled that "the fact that [Assembly] designated and made [the first floor apartment] available for missionary use does not by such designation automatically qualify [the apartment] as being used 'directly for religious training or for other religious purposes.'"

With respect to the second floor dorm-style room, which Assembly claimed was used to house the needy, the BTLA found that "there was no evidence of any recent historical use [of the room] for such purpose that was more than 'slight, negligible or insignificant' or 'indefinite or prospective.'" The BTLA noted that the City's director of human services testified that Assembly was not one of the churches identified as providing immediate or short-term housing for the needy. The BTLA specifically found that the grandson's occupancy of the room "was not so much the result of an expression of [Assembly's] intent to provide housing for the needy as it was a consequence of him being related to a member of [Assembly's] advisory board and a convenience for him by not having to find alternative housing."

Assembly asserts that the BTLA erred when it found these areas to be taxable because Assembly's religious use of them, to house the needy and/or furloughed missionaries, was "too infrequent to serve a religious purpose." Assembly contends that the BTLA misapplied the governing law when it based its decision upon the infrequency of the religious use of these

rooms. Assuming, without deciding, that housing the needy and/or furloughed missionaries constitutes a religious purpose, we find no error. We have previously held "that a tax exemption is not warranted when the asserted compliance with any of the requirements therefor is no more than slight, negligible or insignificant, indefinite and prospective, or theoretical." *Appeal of City of Concord*, 161 N.H. at 351 (quotations and citations omitted).

Assembly's remaining arguments about the space occupied by the grandson are based upon its misreading of the BTLA's decision. Contrary to Assembly's assertions, the BTLA did not find that "residential use cannot be tax exempt." Nor did it focus upon the grandson's use of the space, instead of Assembly's use of it.

Assembly next addresses the caretaker's housing. Assembly argues that "since the beginning of time[,] . . . churches have had onsite caretakers and this did not negate their status as churches." Again, Assembly misreads the BTLA's decision. Nothing in that decision contravenes Assembly's "status" as a church.

█ Assembly further asserts that the BTLA erred when it found that there was "no compelling evidence" that the caretaker's "physical presence at the Property was necessary for the religious use of the Property by [Assembly]." Assembly argues that, in fact, the caretaker's physical presence was necessary for security, and implies that providing security constitutes use for a religious purpose. Assuming, without deciding, that providing security for a church is a religious purpose, we uphold the BTLA's finding that the caretaker's physical presence for that purpose was not necessary. *But cf. Appeal of City of Nashua*, 155 N.H. at 446 (providing maintenance and security services to deconsecrated parishes were not religious purposes). The BTLA found that the caretaker's physical presence was not necessary to secure Assembly's property because "the main building could be secured (even the 'prayer room' which had 24/7 exterior access had its interior door locked), and the adjacent parsonage provided on-site physical presence for any security concerns." As the record supports these findings, we uphold them. To the extent that Assembly contends, in effect, that the BTLA failed to weigh the testimony properly, we defer to its judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. *See LLK Trust v. Town of Wolfeboro*, 159 N.H. 734, 739 (2010).

█ Assembly next asserts that the BTLA's finding that the second floor men's bathroom was not "significant or critical for the religious use of the Property" was erroneous. The BTLA found that the bathroom "appeared to exist primarily to serve any occupants of the second floor dorm rooms

and did not appear to be critical for the congregation's activities that occur on the first floor." To the extent that the bathroom was used by congregants, "such use," the BTLA found, "did not appear to be significant or critical for the religious use of the Property on the first floor." Assembly apparently challenges these findings as unreasonable because the caretaker testified that parishioners used the second-floor men's room during worship services. Assembly, thus, impliedly asserts that the BTLA failed to weigh the testimony properly. We defer to the BTLA's judgment in determining the weight to be given evidence. *See id.* Because Assembly has not demonstrated by a clear preponderance of the evidence, *see* RSA 541:13, that the second-floor restroom was "owned, used and occupied directly for religious training or for other religious purposes," RSA 72:23, III, we cannot find error in the BTLA's finding such space taxable.

We have reviewed Assembly's remaining arguments regarding whether the BTLA erred in its apportionment between tax-exempt and taxable uses of the property and conclude that they warrant no extended consideration. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993); *see also Sabinson v. Trustees of Dartmouth College*, 160 N.H. 452, 459 (2010) (declining to address arguments that are insufficiently developed for appellate review).

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.